**In re DeAngelo STARNES, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 02–BG–855.**

District of Columbia Court of Appeals.

Argued July 17, 2003.

Decided July 31, 2003.

---

Rudolph Acree, Jr., for respondent.

Ross T. Dicker, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before WAGNER, Chief Judge, and FARRELL and GLICKMAN, Associate Judges.

PER CURIAM:

In agreement with its Hearing Committee, the Board on Professional Responsibility concluded (1) that respondent DeAngelo Starnes violated Rule 8.1(a) of the Rules of Professional Conduct by falsely stating in connection with his application for admission to the District of Columbia Bar that the legal work he had been doing was supervised by an attorney licensed to practice in the District of Columbia; and (2) that after being admitted to the District of Columbia Bar, Starnes violated multiple other disciplinary Rules [1] by seriously neglecting his obligations to his clients, failing to provide competent representation, abandoning his clients, and failing to withdraw as their counsel after he began working full time for a federal agency and could no longer shoulder his duties to his private clients. Starnes concedes all but the Rule 8.1(a) violation. As an appropriate sanction, the Board recommends that Starnes be suspended from the practice of law for six months and that he be required to demonstrate his fitness before he is reinstated. Starnes objects that this sanction is too harsh. Bar Counsel takes no exception to the Board's findings or its recommended disposition.

The pertinent portions of the Board's report are appended to this opinion. Substantially for the reasons that the Board states, we accept the Board's findings and impose the sanction that the

---

1. Specifically, Rules 1.1(a), 1.1(b), 1.3(a), 1.3(b), 1.3(c), 1.4(a), and 1.16(a).

Board recommends. *See* D.C. Bar R. XI, § 9(g)(1) ("[T]he Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted."). The ethical violations in this case are essentially undisputed.[2] And because this case involves considerably more, in our view, than simple neglect of duties, we are not persuaded by Starnes's contention that a six-month suspension is unduly punitive or is inconsistent with sanctions meted out in comparable cases to protect the public. *See In re Lyles,* 680 A.2d 408, 418 (D.C.1996); *In re Rosen,* 570 A.2d 728, 730 (D.C.1989). Nor are we persuaded that the delay in concluding his disciplinary proceeding has prejudiced Starnes materially or justifies a reduction of his sanction beyond the consideration that the Board's recommendation already shows.[3] *See In re Fowler,* 642 A.2d 1327, 1331 (D.C.1994) (holding that circumstances must be "unique and compelling" for delay to mitigate an otherwise appropriate disciplinary sanction that is imposed to protect the public interest).

■ We note, in particular, the importance of the requirement that Starnes demonstrate his fitness to practice law in view of the concerns that his unremedied[4] violations raise regarding his honesty, competence, trustworthiness and professional responsibility. *See, e.g., In re Small,* 760 A.2d 612, 614 (D.C.2000) (identifying respondent's "lack of candor with respect to his application for admission" as one factor justifying the imposition of a fitness requirement); *In re Delate,* 579 A.2d 1177, 1181 (D.C.1990) ("given respondent's behavior revealed in this record—virtual abandonment of her conservatorship responsibilities in two cases—she should not be permitted to resume practice automatically upon expiration of her suspension"). The factors to be considered in assessing fitness for reinstatement have been set forth in *In re Roundtree,* 503 A.2d 1215, 1217 (D.C.1985). They include the measures that the respondent has taken to make restitution and to address with specificity the personal and professional deficiencies that led to his ethical violations. *See, e.g., In re Tinsley,* 668 A.2d 833, 834–38 (D.C.1995).

It is hereby ORDERED that respondent DeAngelo Starnes be suspended from the practice of law in the District of Columbia for six months, effective thirty days from the entry of this order, and that he be required to show fitness to practice as a

---

2. Starnes concedes most of the violations and challenges only the Board's determination that he violated Rule 8.1(a) by knowingly misleading the Admissions Committee about his pre-admission unauthorized practice of law in the District of Columbia in violation of Rule 49 of this court's Rules. We see no merit in Starnes's claim that the Board lacked jurisdiction to consider the Rule 8.1(a) violation because the Admissions Committee (allegedly) did not believe that he had violated Rule 49. And while Starnes claims that his admittedly misleading statements to the Admissions Committee were inadvertent and immaterial, the Board had sufficient evidence to conclude otherwise.

3. The Board states in its report that "[al]though a nine-month suspension has been imposed in somewhat similar cases, we conclude that six months is sufficient to protect the public in this case, in light of Respondent's repentant attitude [citation and footnote omitted], and the significant delay in the preparation of the Hearing Committee's report in this case." *See Appendix, infra,* REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY at 22.

4. Starnes has not (yet) made restitution to his clients for the harm he caused them.

condition of reinstatement. Respondent's attention is directed to D.C. Bar R. XI, §§ 14 and 16, which address the duties of suspended attorneys and the procedures for reinstatement.

## APPENDIX

## [EXCERPTED BOARD REPORT]

## DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of DEANGELO STARNES, Respondent.

Bar Docket Nos. 269-97, 287-97 & 454-97.

## REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

In these three consolidated matters, Bar Counsel charged Respondent with violations of several disciplinary rules, including Rules 1.1(a), 1.1(b), 1.3(a), 1.3(b), 1.3(c), 1.4(a), 1.7(b)(4), 1.16(a), and 8.1(a). After several days of hearings, Hearing Committee Number Six found no violation of Rule 1.7(b)(4), but otherwise sustained those charges.[1] The Hearing Committee recommended that Respondent be suspended from the practice of law for six months, with three months of that sanction stayed, and that Respondent be placed on one year of probation and monitoring should he return to private practice. *See* HC Rpt. 44–45.

Respondent excepts to the Hearing Committee's conclusion that he violated Rule 8.1(a), and argues that a public censure or a shorter period of suspension should be imposed.[2] Bar Counsel excepts to the Hearing Committee's conclusion that Respondent did not violate Rule 1.7(b)(4), and argues strenuously that a lengthier period of suspension (nine months) is warranted, along with a requirement that Respondent demonstrate his fitness to practice law before being allowed to resume practice. After reviewing the Hearing Committee's report and the record, we conclude that the Committee reached correct determinations as to the violations. We therefore sustain all the Committee's violations findings including the Committee's conclusion that Respondent violated Rule 8.1(a), and its conclusion that he did not violate Rule 1.7(b)(4).

On the question of sanction, we agree in part with Bar Counsel that the sanction recommended by the Committee is insufficient. We recommend that Respondent be suspended for six months, and that he be required to show fitness before resuming the practice of law in the District of Columbia. We also find this case inappropriate for probation.

## I. FINDINGS OF FACT

1. *Respondent's Admission to the D.C. Bar*

Respondent is a member of the District of Columbia Bar, having been admitted after examination on August 26, 1996. As the Hearing Committee observed, the pro-

---

1. Bar Counsel also initially charged Respondent with violations of Rules 3.3(a), 8.4(c), and 8.4(d). After the hearing, Bar Counsel declined to pursue the charges under Rules 3.3(a) and 8.4(c). The Hearing Committee found no violations of those charges, or of Rule 8.4(d). HC Rpt. 38–39. Bar Counsel did not except to those determinations, and we find no basis in the record for overturning them.

2. Respondent does not except to the Hearing Committee's conclusions that he violated the "neglect rules," *i.e.*, the violations other than Rule 8.1(a). *See* Resp. Br. 5–6.

cess of Respondent's admission to our Bar was "long and tortuous." HC Rpt. 7.[3]

Respondent is a member of the California Bar and initially attempted to secure admission to the D.C. Bar by waiver. In January 1994, Respondent submitted a waiver application to the District of Columbia Court of Appeals' Committee on Admissions, based on his membership in good standing in the California Bar. Two months later, and just days before the waiver period expired, Respondent received a letter from the Committee on Admissions requesting additional information. Although he promptly responded to that request, the delay in requesting the information resulted in the expiration of his Certificate of Good Standing from the California Bar. Respondent was unable to obtain a replacement Certificate in time to meet the time limits for waiving into the D.C. Bar, and his application was returned again. Following an unsuccessful appeal of this matter, Respondent was therefore compelled to sit for the July 1994 District of Columbia Bar Examination in which he was not successful. He sat again for the February 1995 Bar Examination. He was notified in April 1995 that he passed.

Respondent's success on the Bar exam triggered the character and fitness phase of the admissions process. On June 19, 1995, Claire Root, who served as Director of both the Committee on Admissions and the Court of Appeals' Committee on Unauthorized Practice of Law ("UPL Committee"), sent Respondent a letter on behalf of the Committee on Admissions requesting additional information. The letter was oc-

casioned in part by the fact that, in his applications for admission, Respondent had stated that he had been employed as an "associate" at a D.C. law firm:

> [Y]our application reflects that you were admitted to the California Bar in October 1992 and that since July 1992 you have been employed as an associate with several firms in the District of Columbia. Provide an explanation/description concerning the nature of your duties. Also please advise the members concerning your current employment and/or any other circumstances to update your applications which were filed on June 23, 1994, and on February 6, 1995.

BX C–7(a). On August 10, 1995, in response to this Committee inquiry, Respondent wrote:

> [A]ll my work is subject to the supervision of an attorney licensed to practice law in the District of Columbia. I have not independently drafted any documents which would affect the personal or real property rights of any individual, nor provided or expressed a formal legal opinion to anyone, nor consulted with respect to any of the foregoing, without being so advised and on behalf of an attorney licensed to practice law in the District of Columbia. Finally, I have never made a court appearance in the District of Columbia, nor have I signed any court pleading submitted in the District of Columbia.

BX C–7(b).

Meanwhile, an ethical complaint concerning Respondent had been filed with Bar Counsel about his representation of Mr. Eric Mitchell. After the Office of Bar

---

**3.** The Hearing Committee expressed dissatisfaction with what it perceived to be the rather desultory fashion in which the Committee on Admissions and the Committee on Unauthorized Practice of Law handled Respondent's case. *See* HC Rpt. 11–12, 42. While it ap-

pears from hindsight that Respondent's case could have been treated with greater dispatch, we do not share any intimation that the Committees deserve any part of the blame for Respondent's violation of Rule 8.1(a).

Counsel reviewed the Mitchell complaint and determined that Respondent was not licensed to practice law in the District of Columbia, it referred the matter to the UPL Committee. In September 1995, the UPL Committee began to investigate the Mitchell matter. That investigation was conducted by a member of the UPL Committee, John Mott, who interviewed Respondent by telephone. After reviewing Respondent's letterhead on a letter to Mr. Mitchell dated September 14, 1995, which described himself as "Attorney at Law" with a D.C. address, but without a notation that he was not admitted to practice in D.C., Mr. Mott advised Respondent that he was in violation of D.C.App. R. 49, prohibiting the unauthorized practice of law. Mr. Mott did not investigate any activities of Respondent other than the Mitchell matter.

On February 16, 1995, Mr. Mott and the Chair of the UPL Committee, Stuart Pierson, generated a report on Respondent's activities, in which they concluded that Respondent had violated D.C.App. R. 49. They did not, however, recommend further action against Respondent, and they noted that Respondent had represented that he had changed his letterhead. That report was introduced into the file on Respondent's application for admission, and the Committee on Admissions decided to conduct a personal, informal interview with Respondent. After that interview, the Committee on Admissions voted to certify Respondent's admission to the Bar. Respondent was then duly admitted to the D.C. Bar.

2. *Inaccuracy of Respondent's Letter to the Committee on Admissions*

Unfortunately, Respondent's letter of August 10, 1995, to the Committee on Admissions was inaccurate even at the time

it was written, and those inaccuracies were never corrected. First, the letter was inaccurate with respect to the Mitchell matter. Although Respondent told the Committee on Admissions that he had not independently drafted any documents "which would affect the personal or real property rights of any individual" without being supervised by an attorney licensed to practice law in the District of Columbia, in fact, prior to drafting and sending the August 10, 1995, letter to the Committee on Admissions, Respondent drafted a complaint for absolute divorce for Mr. Mitchell to be filed over Mr. Mitchell's signature in a Maryland court, and accepted money from Mr. Mitchell for drafting the complaint. BX C–7(b).

Second, on August 2, 1995, Mr. Billy P. Greer retained Respondent to represent him in connection with an Equal Pay Act claim against his employer the University of the District of Columbia ("UDC"), where he was employed as a temporary security guard. Mr. Greer had been passed over in his bid to obtain a permanent position at the University after eight years on the job. He retained Respondent to help him obtain back pay he believed he was owed under the Equal Pay Act. He met with Respondent at the latter's home in the District of Columbia, and Respondent agreed to represent Greer as his lawyer, stating that his fee would be $1,500.

Third, and most strikingly, on the very same day that Respondent sent his letter to the Committee on Admissions, Respondent signed a retainer agreement with a client, Tel–Art Communications, in which he represented that the "LAW OFFICES OF DEANGELO STARNES" had agreed to represent Tel–Art in litigation brought by Tel–Art against CIGNA Insurance Company in the Superior Court of the District of Columbia. The retainer agree-

ment gave no indication that Respondent was not admitted to practice in D.C., or that he was to be supervised in his work for Tel–Art by a D.C. attorney. One day later, on August 11, 1995, a scheduling conference was held in the case and a praecipe was filed, entering the appearance of Mr. Michael Luster, a D.C. attorney, as attorney for Tel–Art. Respondent was loosely associated with Mr. Luster; he sometimes used Luster's letterhead and often used Luster's mail and telephone service, although Luster actually worked out of his home. The record does not establish who, if anyone, appeared in Superior Court on behalf of Tel–Art on that date.[4]

### 3. *Representation of Tel–Art*

As the Hearing Committee found, Respondent's representation of Tel–Art Communications was not satisfactory to the client. Respondent propounded discovery requests in 1995, before he was admitted to the D.C. Bar. Serious difficulties began in 1996, when Mr. Luster's D.C. office mail and telephone services, which Respondent shared, were interrupted on a number of occasions for failure to pay the monthly rent.[5] These interruptions lasted for up to 10 days at a time. Opposing counsel attempted to communicate a settlement offer to Tel–Art via Respondent in early May 1996, by leaving a voice-mail message. Weeks later, Respondent wrote a letter rejecting the offer until discovery was answered. Not until August 1996, however, did Respondent receive the defendant's unexecuted and overdue discovery re-

sponses. Respondent never moved to compel discovery from CIGNA.

Correspondence from opposing counsel, Jo Anna Schmidt, reflected that she had been unable to contact Respondent by phone in June 1996. On August 7, 1996, Tel–Art's Florida counsel, Howard J. Milchman, also wrote to Respondent at Mr. Luster's office, advising of his unsuccessful efforts to reach Respondent and requesting that Respondent "contact this office immediately so that we may apprise the client of what is going on with this case." BX A–4 at 5.

On October 28, 1996, Respondent accepted full-time employment as an attorney with the United States Environmental Protection Agency ("EPA"), at the agency's office in the District of Columbia. Respondent did not inform Tel–Art of his new employment. Respondent's ability to contact opposing counsel for settlement talks during working hours also ceased at that point, because Respondent was precluded from using the telephone in his government office for personal use. On numerous occasions from August 1996 through January 1997, opposing counsel tried unsuccessfully to contact Respondent by phone and by mail regarding settlement. Milchman's numerous efforts to reach Respondent by phone, from December 1996 to August 1997, to ascertain the status of the Tel–Art suit also were unsuccessful. On February 20, 1997, Respondent telephoned Ms. Schmidt to say that soon he would make a counter-demand. Ms. Schmidt wrote to Respondent in late February 1997 and again in April 1997. Along with the April letter, Ms. Schmidt

---

4. Respondent testified that he did not appear, and that he simply accompanied Luster. Luster, however, has no recollection whether he attended the August 11, 1995 hearing. Opposing counsel could not remember whether she attended at all.

5. As noted above, Luster was technically attorney of record in the Tel–Art Communications litigation, but he never had anything to do with Tel–Art after the status conference on August 11, 1995. Luster was very ill from October 1995 to January 1996.

sent Respondent a $2,000 insurance draft in full settlement of Tel–Art's claim, plus a draft release form. The letter and draft were sent by certified mail to Luster's office mail drop address at 601 Pennsylvania Avenue N.W. Although Respondent received this settlement offer, he did not convey it to his client.

Sometime in the spring of 1997, Mr. Luster canceled his phone and mail services at 601 Pennsylvania Avenue, N.W. On April 9, 1997, before Respondent received Ms. Schmidt's letter and check, Respondent wrote to Schmidt demanding $7,500 in settlement. Thereafter, Respondent ceased to do any more work for Tel–Art. He failed to communicate this fact to his client. In June 1997, Mr. Milchman wrote to Respondent at his home and at Luster's former business address, seeking a status report and expressing dissatisfaction with Respondent's failure to communicate with the client. Milchman's request for an immediate response went unanswered.

In the summer of 1997, another CIGNA attorney, Thomas Bell, contacted Respondent about the Tel–Art matter. At that point, Respondent demanded $3,602.55 to settle the case, but he failed to follow up with promised supporting documentation. Ms. Schmidt's certified letter on September 17, 1997, to follow up on Bell's earlier efforts to reach Respondent also went unanswered. Respondent never received that letter, which was mailed to 601 Pennsylvania Avenue, N.W., because his mail service to that address had long since been canceled. Respondent had failed to provide a forwarding address or to notify opposing counsel of his change of address.

On October 15, 1997, after Tel–Art had not heard from Respondent in nearly a year, Arthur Levinson, the President of Tel–Art, applied to the District of Colum-

bia Bar's Clients' Security Fund for reimbursement of the $2,000 retainer paid to Respondent, indicating that Respondent had "disappeared; whereabouts unknown; cannot be reached," regarding his representation in the Tel–Art suit. BX A–1. In early 1998, CIGNA representatives contacted Mr. Levinson directly to advise that it had been unable to reach Respondent and that it wished to reach a settlement. Once Tel–Art provided the information CIGNA had long sought, the parties were able to settle the case in two phone calls.

4. *Representation of Billy Greer*

Respondent's representation of Billy Greer had many of the same failings as his representation of Tel–Art. As noted above, Mr. Greer retained Respondent to represent him on August 2, 1995, in connection with an Equal Pay Act claim against UDC, where he was employed as a temporary security guard. Respondent agreed to represent Mr. Greer as his lawyer, and stated that his fee would be $1,500. Greer gave Respondent a partial retainer of $300.00, for which Respondent provided a receipt that included the outstanding balance of $1,200. Respondent did not tell Mr. Greer that he was not yet admitted to practice in the District of Columbia, nor did he provide him with a written statement about the scope of his representation. In September and October of 1995, Respondent received two additional payments from Mr. Greer.

In September 1995, Respondent wrote a letter to the Mayor of the District of Columbia on behalf of Mr. Greer, with a copy to the Corporation Counsel, entitled "Notice of Claim–Violation of Equal Pay Act." BX A–9 at 3. The letter was written on the letterhead of Michael Luster & Associates. Respondent listed himself as "of counsel" and "admitted in California." *Id.* In October 1995, the Civil Division of the Office of

the Corporation Counsel responded, assigning Claim No. 6391 to the matter. In December 1995, Respondent sent a letter to UDC, asserting a claim on behalf of Mr. Greer against the University for "violating the Equal Pay Act." BX B–15, "Exhibit B" at 2. That letter lists Respondent as "of counsel" in the Office of Michael Luster & Associates. *Id.*

In January 1996, Mr. Greer made an additional payment to Respondent, reducing the outstanding balance to $300. Subsequently, Greer paid the balance owing on the retainer fee. Mr. Greer obtained information on his case only when he stopped by Respondent's home to make a payment.

On April 5, 1996, Respondent wrote to the then President of UDC, Dr. Tilden Lemelle, on behalf of Mr. Greer and two other University employees, demanding a response to his letter within one week in order to "resolve these problems amicably." BX B–15, "Exhibit B" at 1. He received no response. At that point, Respondent understood that he would have to file another grievance with the University in order to advance Mr. Greer's case. Respondent took no such action himself, nor did he ask Mr. Luster to do so.

After he commenced employment at the EPA, Respondent received a directive from his employer requiring that he relieve himself of the burdens of private cases, including a warning that client matters relating to the District of Columbia might constitute a conflict of interest with his federal employment. Respondent failed to advise Mr. Greer, however, that his federal employment precluded him from continuing to handle any matters involving the District of Columbia (including

UDC). In fact, in the brief contact Respondent had with Mr. Greer during the period August through December 1996, Respondent told Greer that he "had to do some research and everything was just going as planned." Tr. III at 65.[6]

In January 1997, Respondent prepared a "Statement of Grievance" on plain letterhead, and gave it to Mr. Greer to submit to the University. On January 30, 1997, Mr. Greer delivered the letter prepared by Respondent to the then President of UDC, Dr. Julius Nimons. Respondent had no further direct communication with his client. Respondent sent a letter to Mr. Greer, dated November 4, 1997, but postmarked February 13, 1998, in which he advised that he would no longer be able to represent Mr. Greer because he was no longer in the private practice of law, and enclosed Greer's file.

### 5. *Representation of David Surratt*

In November 1995, at Mr. Greer's suggestion, David H. Surratt, Sr. met with Respondent at Respondent's home to discuss representation in an administrative appeal of a pay and position dispute against UDC, which had been pending since 1986. Surratt sought the assistance of "someone that could finish it up for [him]." Tr. IV at 83.[7] Respondent agreed to help, and requested a retainer of $1,500, payable in $150.00 monthly installments. No retainer agreement was drawn up. Mr. Surratt turned over his file, and Respondent agreed to take his case "through its completion through the court system." *Id.* at 143. Thereafter, and prior to Respondent's admission, Mr. Surratt made at least six payments to Respondent, noting on the checks that the payments were for

---

6. "Tr. III" designates the transcript of the hearing on February 26, 1999.

7. "Tr. IV" designates the transcript of the hearing on May 3, 1999.

"legal fees" or "legal services." BX E–6 at 14–17.

On April 5, 1996, Respondent wrote to UDC President Lemelle, c/o the Office of General Counsel at the University, regarding Mr. Surratt's claim, among others. In his letter, Respondent advised that he had run out of patience and called for a response by April 12, 1996, implying some further action would be taken if a response was not forthcoming. UDC did not respond. On June 5, 1996, Respondent wrote again to Dr. Lemelle, c/o the General Counsel of the University, to request a final decision on Mr. Surratt's administrative appeal no later than June 12, 1996. Again, there was no response.

Around August 1996, Respondent advised Mr. Surratt that he should obtain sworn statements from the UDC Personnel Committee members who had knowledge of his ten-year old grievance. Mr. Surratt collected these statements after tracking down the individuals, some of whom were located as far away as North Carolina, and gave them to Respondent.

In October 1996, Mr. Surratt advanced the filing fee for a court action Respondent said he would file in the matter. From the date of his admission to the Bar in August 1996 to January 1997, Respondent took no action on Mr. Surratt's matter. When Respondent accepted full-time employment as an attorney with the EPA in October 1996, he did not advise Mr. Surratt of his new position or of Mr. Surratt's need to find new counsel. Indeed, Respondent ceased all communication to Mr. Surratt, despite Mr. Surratt's numerous unsuccessful efforts to contact Respondent at his home and at Mr. Luster's office.

In January 1997, Mr. Surratt went to the D.C. Court of Appeals to inquire as to the status of his case, which he believed Respondent had filed on his behalf. The Clerk's Office informed him that no such action was filed. Unable to reach Respondent, Mr. Surratt consulted with James E. McCollum, Jr., Esquire, concerning this and other matters. McCollum agreed to assist in contacting Respondent to get more information. In this regard, on January 28, 1997, McCollum wrote (and faxed) a letter to Respondent at Luster's office address, advising that Surratt requested McCollum's advice on certain legal matters, and specifically requesting the name and case number on Surratt's court case as well as copies of documents related to the case.

On February 5, 1997, without first contacting Mr. Surratt, Respondent filed a "Petition to Compel Agency Action" in the D.C. Court of Appeals. The petition was assigned Docket Number 97–AA–164. Respondent listed his professional address as 601 Pennsylvania Avenue, N.W., Suite 900, Washington, D.C., Mr. Luster's office address. Although Mr. Luster had not yet cancelled his phone and mail service at that location, Mr. Starnes had long since ceased using that location for the practice of law. While Respondent served a copy of the Petition on the University on or about the same date, he did not furnish a copy to Mr. Surratt.

When, on February 19, 1997, Mr. McCollum had still not heard from Respondent, McCollum tried to locate him via Mr. Luster with whom he believed Respondent still had a professional relationship. He sent a letter to Mr. Luster, requesting an update on Mr. Surratt's matter and for delivery of Mr. Surratt's documents. Mr. McCollum does not remember ever receiving a response from Mr. Luster. Mr. Surratt's continued efforts to reach Respondent were unsuccessful.

On April 4, 1997, Mr. McCollum received a letter from Respondent, which advised that his effort to file a Petition for Review of Agency Action on Surratt's behalf was dismissed for lack of jurisdiction, but that he had recently filed a Petition to Compel Agency Action in the D.C. Court of Appeals. He advised Mr. McCollum that the action was pending. Again, the letter and envelope reflected Mr. Luster's former business address.

Respondent's letter failed to advise Mr. McCollum that a docketing statement in the case was already overdue. The letter also neglected to inform either Mr. McCollum or Mr. Surratt that Respondent was now engaged in federal employment, which precluded him from further representation of Mr. Surratt.

On April 22, 1997, Mr. McCollum replied that he wished to obtain copies of the remainder of the file and requested a meeting with Respondent. The letter was mailed to the address provided by Respondent, but was returned by the U.S. Postal Service.

A few days later, the D.C. Court of Appeals sent an Order in Surratt's case, dated April 25, 1997, to Respondent at his (incorrect) address of record, directing the petitioner to file a docketing statement within 20 days of the date of the Order as well as a motion to file the docketing statement out of time. As Respondent had neglected to file a change of address, he did not receive a copy of the Order. No docketing statement was filed.

In early May 1997, McCollum sent a reminder letter to Respondent about delivery of Surratt's file materials, and renewed his request for phone contact. This letter was also returned by the Postal Service. McCollum sent additional letters to Respondent on May 12, 14, 16, and 20, 1997. All were returned to the sender.

On June 5, 1997, Mr. Surratt went to the D.C. Court of Appeals to review the court jacket in his case. He discovered the Court's April 25, 1997 Order, the time for compliance with which had expired. Surratt, on his own, filed a motion for an extension of time to file the docketing statement, advising the Court of his late discovery of the Order and his inability to reach his attorney. The Clerk of the Court returned Surratt's extension motion, advising that such a motion must be filed by counsel. Surratt made repeated, but unsuccessful, efforts to reach Respondent by phone. Surratt did learn that Respondent's office phone (Luster's former business number) was disconnected.

On June 10, 1997, UDC filed a motion for summary dismissal of the petition, a copy of which was served on Respondent at his yet-uncorrected address of record. A copy of this motion was sent to Respondent. On November 3, 1997, Respondent filed a motion to withdraw his appearance in Surratt's case in the D.C. Court of Appeals, explaining that he was now a federal employee and that he had been advised, shortly after his tour commenced, that his continued representation of Mr. Surratt was a potential conflict of interest and a potential violation of 18 U.S.C. §§ 203 and 205. Respondent added that he had not advised Mr. Surratt of this development because he thought their attorney-client relationship was terminated. Although Respondent indicated that he served Mr. Surratt with a copy of the motion, the certificate reflects an incorrect address, and Mr. Surratt never received it.

On November 21, 1997, the D.C. Court of Appeals granted Respondent's motion to withdraw and dismissed Mr. Surratt's Petition for Review. A copy of the Order was sent to Mr. Surratt at the incorrect

address listed in Respondent's motion to withdraw. Consequently, Mr. Surratt did not receive it in a timely manner.

## II. CONCLUSIONS OF LAW

### A.

Respondent has not excepted to the Hearing Committee's conclusions that he violated Rules 1.1(a) and 1.1(b) with respect to the Surratt matter, and Rules 1.3(a), 1.3(b)(1), 1.3(c), 1.4(a), 1.16(a) with respect to the Tel–Art, Greer, and Surratt matters. We have carefully reviewed the Hearing Committee's report on these charged violations and find it to be thorough and well-reasoned. We adopt those portions of the Committee's Report, which are appended to the Board's Report in this case. *See* Appendix. We also note, as the Hearing Committee did, that there is ample evidence to support determinations that Respondent violated these Rules even *after* the date of his admission to the D.C. Bar. Thus, we need not determine whether Respondent's conduct with respect to these three matters before the date of his admission may be considered when determining whether he violated those Rules.

### B.

Respondent's principal contention is that his letter of August 10, 1995, to the Committee on Admissions did not violate Rule 8.1(a). That Rule provides that "[a]n applicant for admission to the Bar ... shall not ... [k]nowingly make a false statement of material fact." As noted above, it can scarcely be disputed that Respondent's letter of that date was false in its statement of material fact that Respondent was at all times working under the supervision of licensed D.C. attorneys. Respondent's position is that his statement to that effect was merely negligent, and not knowingly false. Respondent maintains that in February 1995, when he applied for admission in conjunction with the Bar examination, he told the Committee on Admissions that he was working at all times under the supervision of a D.C. attorney, and that that statement was true at that time; and that in August 1995, when the Committee on Admissions asked Respondent for an update of his employment situation, he carelessly repeated the same assertion.

We conclude, however, that the record establishes by clear and convincing evidence that Respondent's false statement to the Committee on Admissions was knowingly made.[8] It is impossible to overlook or to discount the arresting fact that, on the very same day that Respondent penned a letter to the Committee on Admissions asserting that he was always working under the supervision of a D.C.

---

**8.** We agree with the Hearing Committee that the Court and the Board have jurisdiction over Rule 8.1(a) violations that occurred before the attorney became a member of the D.C. Bar, and we note that the Board and the Court have exercised such jurisdiction before, although without discussing the point. *See In re Small,* 760 A.2d 612 (D.C.2000)(per curiam). D.C.App. R. XI, § 1, provides that all members of the District of Columbia Bar are "subject to the disciplinary jurisdiction of [the Court of Appeals] and its Board on Professional Responsibility." Respondent, having been admitted here, is therefore presently subject to our, and the Court's, jurisdiction.

Moreover, Rule 8.1 by its terms does not limit its scope to false statements that an attorney made after becoming a member of our Bar (*e.g.,* false statements made in applying for admission to practice elsewhere). Although in general our Rules of Professional Conduct speak of the duties of a "lawyer," Rule 8.1(a) imposes a standard of conduct for an "applicant for admission" rather than a "lawyer." Thus, once an attorney becomes admitted to practice in D.C., he becomes subject to our disciplinary jurisdiction for any false statements he may have previously made in applying for admission to practice law.

attorney and had not made any appearances in D.C. courts, he also executed a retainer agreement in the name of his own law offices, agreeing to represent a party in civil litigation in the D.C. courts, without any suggestion he would be supervised or would need supervision by another, D.C.-licensed attorney. That proof that Respondent knowingly made that false statement to the Committee on Admissions is only buttressed by the fact that when Respondent wrote that letter he had very recently taken on at least two other representations (the Greer and Mitchell matters), without the slightest indication that he would be supervised by a D.C.-licensed attorney. To be sure, the proof of Respondent's state of mind in writing the letter to the Committee on Admissions is circumstantial, but more direct proof of state of mind, such as an outright assertion of an individual's intent, is rarely available. *Cf. Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The circumstantial evidence in this case is about as persuasive as such evidence ever is about an individual's state of mind.[9]

\* \* \* \* \* \*

## III. SANCTION

We have here an attorney who used a false statement to gain admission to the Bar, and who immediately thereafter seriously neglected three separate matters. Respondent's misstatement tainted the admissions process by depriving the Committee on Admissions of the opportunity to conduct a proper character and fitness inquiry. It is true, as Respondent argues, that the Committee on Admissions was made aware of his pre-admission representation of Eric Mitchell and nonetheless voted to certify his admission. The Committee on Admissions was not made aware, however, that Respondent had agreed to represent at least three other clients as well while he was still unlicensed to practice law in the District. To the contrary, the Committee on Admissions was informed that Respondent had altered his letterhead after being cautioned by Mr. Mott, seemingly removing the implication that he was practicing law in this jurisdiction. Had the Committee on Admissions been aware that Respondent was running a full-time law practice in the District without being licensed to practice law here, it might well have denied him admission or taken some other action.

With his false statement to the Committee on Admissions, Respondent started his membership in our Bar on shaky grounds. Then, immediately after his admission, Respondent stumbled badly. Although the Hearing Committee did not find evidence of dishonesty in Respondent's dealings with his clients (see HC Rpt. 38–39), the pattern of neglect is a distressing one, indicating that Respondent has difficulty in meeting fundamental demands of law practice, including basic requirements of client communication and getting work done. As the Hearing Committee stated, "in all three cases, he took client money pre-admission, performed minimal work for these clients once he was admitted to the

---

**9.** Because we find that Respondent acted intentionally, it is not necessary for us to decide whether, as Bar Counsel suggests, a violation of Rule 8.1(a) may be established by proof that the attorney's false statement was made recklessly. The Court of Appeals ruled that the predecessor rule, DR 1–101(A), was violated by false statements that were recklessly made. *See In re Rosen*, 570 A.2d 728, 730 (D.C.1989)(per curiam). DR 1–101(A) was crucially different from Rule 8.1(a), however, in that it did not contain any express state of mind requirement, whereas Rule 8.1(a) expressly refers to a "knowingly" made false statement. *See Rosen*, 570 A.2d at 730.

Bar (except for Mr. Surratt, where he filed a Petition) and then, ultimately, abandoned the clients." HC Rpt. 43–44. Although we have not found that Respondent's continued representation of his clients during his period of federal employment amounted to a conflict of interest in violation of Rule 1.7(b)(4), we have concluded that Respondent demonstrated a lack of awareness of his obligation to either provide competent representation on behalf of his private clients even while he was employed full-time at the EPA, or to inform his clients that he could not continue to represent them competently, and thus to withdraw from the representation.

Under the circumstances, we agree with Bar Counsel that a substantial period of suspension, accompanied by a fitness requirement, is warranted in this case. That is the sanction that has been imposed in similar cases. *Cf. In re Kennedy,* 605 A.2d 600 (D.C.1992) (per curiam) (nine-month suspension and fitness for repeated violations of Maryland rules against unlicensed practice); *In re Rosen,* 570 A.2d 728 (D.C. 1989) (per curiam) (nine-month suspension and fitness for false statement made under oath in Maryland bar admission process). We recommend a six-month suspension. Although a nine-month suspension has been imposed in somewhat similar cases, we conclude that six months is sufficient to protect the public in this case, in light of Respondent's repentant attitude, *see* Resp. Br. 9–10,[10] and the significant delay in the preparation of the Hearing Committee's report in this case. *Cf. In re O'Duden,* Bar Docket No. 403–95, *et al.* at 23 (BPR June 19, 2001).

A requirement that Respondent show his fitness to practice law before being permitted to resume practice here is necessary to protect the public. We need not decide that every case of a knowing false statement to the Committee on Admissions warrants a fitness requirement, as Bar Counsel seems to suggest. In this case, it is sufficient to observe that the combination of Respondent's uncandid statement to the Committee on Admissions and his systematic and serious neglect of three client matters raise serious questions about his fitness to practice law. For similar reasons, we also agree with Bar Counsel that this is not an appropriate case for probation.

The Hearing Committee cited two principal factors favoring probation. First, the Hearing Committee suggested that Respondent was somewhat ill-used in the process of his attempting to gain admission to the Bar. *See* HC Rpt. 44–45. We do not find any such mitigating factor. While the Committee on Admissions might have ruled on Respondent's application in a more expeditious manner, the fact is that Respondent gave the Committee on Admissions good reason to be cautious—indeed more reason than the Committee knew, because of Respondent's false statement. Second, the Hearing Committee found it to be a mitigating factor that all of Respondent's neglect of his cases took place during a short period of time. *See* HC Rpt. 45. We see the case rather differently. Respondent began his membership in our Bar with a false statement and then showed himself unable or unwilling to carry out even minimal responsibilities to

---

**10.** Respondent has suggested that he is willing to make restitution to Mr. Greer and Mr. Surratt on the unearned portion of their retainers. *See* Resp. Br. 10 n. 7. Bar Counsel did not expressly ask for restitution and did not put at issue the amount of restitution that would be due to those clients. Whether Respondent has an obligation to pay restitution and has done so may be considered at Respondent's reinstatement proceeding should he seek to resume the practice of law in this jurisdiction.

three separate clients in the practice of law. We therefore disagree with the Hearing Committee's remark that the violations do not imply "a systemic inability or unwillingness of [Respondent] to engage in the practice of law in an ethical and responsible manner." *Id.* To our mind, they do.

\* \* \* \* \* \*

Accordingly, we conclude that Respondent violated Rules 1.1(a), 1.1(b), 1.3(a), 1.3(b), 1.3(c), 1.4(a), 1.16(a), and 8.1(a), but not Rule 1.7(b)(4). We recommend that Respondent be suspended from the practice of law for six months, and that he be required to demonstrate his fitness to practice law before resuming practice.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: Paul R.Q. Wolfson·

Dated: July 31, 2002

All members of the Board concur in this Report and Recommendation.

APPENDIX

TO REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

Hearing Committee's Conclusions of Law on *Rules 1.1(a), 1.1(b), 1.3(a), 1.3(b)(1), 1.3(c), 1.4(a), 1.16(a)* (Extract from Hearing Committee Report and Recommendation)

B. *Rule 1.1(a) and (b), Failure to Provide Competent Representation*

Respondent is charged with a violation of Rule 1.1(a) and (b) in his representation of Mr. Surratt.

That Rule provides:

(a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation..

(b) A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters.

The Comments to this Rule on competence reflect that a lawyer must demonstrate not only legal knowledge and skill adequate to represent a client effectively, but also thoroughness and preparation. This includes an awareness of and compliance with court rules applicable to a filed action. *DeButts v. LaRoche*, 142 N.H. 845, 711 A.2d 877 (1998).

We are not able to evaluate, on this record, whether Respondent possessed the requisite knowledge and skill to provide effective representation on the substantive aspects of the litigation. What is evident, however, is that Respondent was not familiar with the procedural rules of the D.C. Court of Appeals. As a result, he failed to file a docketing statement in Mr. Surratt's Petition to Compel Agency Action, which is required by D.C.App. R. 7A(a)(1).[9] Moreover, he failed to provide a change of address to the Court. As a consequence of these omissions, Respondent missed the docketing date and did not receive the court orders allowing him additional time and opportunities to maintain the litigation. When the opposing party moved for summary dismissal, serving Respondent and Mr. Surratt at incorrect addresses furnished by Respondent, no opposition was filed, and the Court dismissed the action.

---

**9.** D.C.App. R. 7A(a)(1) requires "in all cases, each appellant, within ten days after filing a ... petition, shall serve a docketing statement in the form specified by this court on all other parties, and shall file four copies thereof of the docketing statement with the clerk."

Respondent argues that he was not obligated to file the docketing statement because Mr. Surratt had retained new counsel to handle his case by that point. Respondent's Proposed Findings of Fact, etc., at 9–10 (no pagination in original). While Respondent may have been confused regarding who was representing Mr. Surratt in the winter of 1997, it was Respondent, himself, who filed the Petition and entered an appearance as attorney of record. Accordingly, it was Respondent's responsibility to contact his client directly to clarify the situation. Moreover, by the time Respondent answered Mr. McCollum's first letter, in which he informed Mr. McCollum for the first time that a petition was filed, the docketing statement was already overdue. The plain fact is that Respondent appeared not to know the procedural requirements of the Court of Appeals and made no effort to comply with them. Furthermore, he made no effort to provide a current address and phone number where he could be reached by his client, the court, or Mr. McCollum. As a consequence, Mr. Surratt's petition was dismissed. Under these circumstances, we hold that Respondent failed to demonstrate requisite competence, thereby violating Rule 1.1(a) and 1.1(b).

## C. *Rule 1.3, Diligence and Zeal*

Respondent is charged with a violation of Rule 1.3(a), (b), and (c) with respect to all three client representations. That Rule provides:

(a) A lawyer shall represent a client zealously and diligently within the bounds of the law.

(b) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules; or

(2) Prejudice or damage a client during the course of the professional relationship.

(c) A lawyer shall act with reasonable promptness in representing a client.

As the language of this rule and accompanying comments reflect, paragraphs (a) and (c) are directed at the lawyer's obligation of due diligence, zealous representation, and reasonable promptness.[10] The Court of Appeals interprets this Rule generally to cover a failure to take action for a significant time to further a client's cause, regardless of whether prejudice to the client results. *See In re Lewis*, 689 A.2d 561, 564 (D.C.1997) (where the Court adopted the Board's determination that a lawyer's failure to file motions or to make himself available for court proceedings and client consultation violated rule). Failure

---

**10.** Comment [1] advises that a lawyer must pursue a matter on behalf of a client "despite ... personal inconvenience to the lawyer, and [ ] take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor." Comment [5] states: "a lawyer should always act in a manner consistent with the best interests of the client." Comment [7] informs: "Perhaps no professional shortcoming is more widely resented by clients than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness. Neglect of client matters is a serious violation of the obligation of diligence." Comment [8] provides: "[d]oubt about whether a client-lawyer relationship still exists should be eliminated by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so."

to comply with court-imposed discovery deadlines and failure to communicate important case developments to a client were found to be violative of DR 6–101(A)(3), the predecessor rule to 1.3(b)(1), in *In re Spaulding,* 635 A.2d 343, 344 n. 1 (D.C. 1993).

A lawyer is said to violate Rule 1.3(b), specifically, when he intentionally fails to seek his client's lawful objectives. Neglect ripens into an intentional violation when the lawyer is aware of his neglect of the client matter, or the neglect is so pervasive that the lawyer must have been aware of it. *In re Lewis, supra,* 689 A.2d at 564.

We hold that Respondent violated Rule 1.3(a), (b)(1), and (c) in all three client representations. Respondent accepted Mr. Greer as a client in August 1995 and Mr. Surratt in November 1995. The following April, he wrote to the President of UDC on behalf of both, seeking an administrative disposition of their employment grievances within one week. BX B–15 (June letter, with attachment) (Blue Exhibit Book § 2). Nothing happened. He wrote again in June 1996, on behalf of Mr. Surratt only, demanding a response within one week. BX G–4 at 38. UDC took no action.

Respondent never took any further administrative or judicial action on behalf of Greer. Instead, in January 1997, Respondent drafted a notice of grievance for Greer to file on his own. Greer did as he was directed. After three months passed with no response from UDC, Greer attempted repeatedly, but unsuccessfully, to reach Respondent at his home and at the 601 Pennsylvania Ave. address to ascertain what was happening in his matter. Respondent never again contacted Greer until disciplinary proceedings got underway. He simply abandoned the representation.

As to Mr. Surratt, Respondent took no further administrative action. Instead, in the summer of 1996, Respondent directed his client to obtain sworn statements to be used in support of a petition for review to be filed in the D.C. Court of Appeals. Mr. Surratt completed the burdensome task of obtaining the statements, which he then turned over to Respondent. He also advanced the cost of the filing fee. BX E–6 at 17. Respondent attempted to file a petition for review, which was returned as premature. He successfully lodged a Petition to Compel Agency Action in February 1997, and then abandoned the case. He failed to file a docketing statement in February 18, 1997 or to respond to the Court's Order of April 25, 1997, and by neglecting to provide a new address, he made it impossible for his client, the Court, or Mr. McCollum to contact him.

Additionally, he failed to check the docket in Mr. Surratt's case to keep himself informed of developments in the case. In the end, he failed to file an opposition to the motion for summary dismissal of Mr. Surratt's petition. The petition was dismissed in November 1997. The prejudice resulting to Mr. Surratt from this neglect also constitutes a violation of 1.3(b)(2).

Respondent repeated his disappearing act in the Tel–Art Communications case, as well. In May 1996, CIGNA's attorney Schmidt communicated a willingness to discuss settlement of a relatively modest civil insurance claim filed by Tel–Art. BX A–4 at 15 (Red Exhibit Book). In August 1996, CIGNA furnished the discovery that Respondent said was essential to such talks. Thereafter, Respondent was not heard from again, despite attempts by CIGNA's attorney in December 1996, April 1997, and September 1997. BX A–4 at 17, 22, 28.

Respondent also put himself beyond the reach of his client, Tel–Art Communica-

tions. From August 7, 1996, until the case settled in 1998, Respondent failed to communicate with his client regarding the status of the matter in spite of at least three letters from Mr. Milchman, Tel–Art Communication's Florida counsel, inquiring into the status and specifically requesting that Respondent contact them (BX 4 pg. 3, 4 and 5) and numerous telephone calls from Milchman to Respondent, which went unanswered. Tr II at 21. Additionally, it is clear from the correspondence from Respondent to his client, as well as from the testimony of Joanna Schmidt, the attorney for CIGNA who was controlling the defense of Tel–Art at all relevant points, that the defendant was creating problems by not responding to discovery, and by not engaging in any negotiation to settle the matter other than to repeat the settlement offer of $1,500.00 previously made to and rejected by Tel–Art. The evidence reflects that Respondent did little to force the matter with the defendant, allowing the case to languish. While the defendant's changes in counsel and movement of the case from office to office certainly did not make the representation smooth, it did not preclude Respondent from responding to his client's inquiries or from answering correspondence from CIGNA when it was sent to him, nor did it excuse his failure to seek intervention from the Court to compel discovery. His failure to keep his client reasonably apprised of his office address only exacerbated the communication failure. Eventually, in March 1998, Tel–Art's Florida attorney stepped in to salvage a settlement, which he was able to accomplish in two telephone calls.

From the foregoing it is clear that Respondent's efforts on behalf of his clients were neither zealous nor diligent in violation of Rule 1.3(a). He also failed to seek the lawful objectives of both Mr. Greer or Mr. Surratt in violation of Rule 1.3(b)(1). That neglect also resulted in prejudice, at least as to Mr. Surratt, in violation of Rule 1.3(b)(2).[11] He also failed to act with reasonable promptness in keeping his clients apprised of developments in their respective cases or in responding with reasonable promptness to CIGNA's offer to settle the Tel–Art case, all in violation of Rule 1.3(c).

### D. *Rule 1.4(a), Communication*

The Specification of Charges alleges a violation under Rule 1.4(a), as well.[12] Rule 1.4(a) requires a lawyer to keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

Comment [2] states that "[a] client is entitled to whatever information the client wishes about all aspects of the subject matter of the representation ...." Comment [3] provides, in pertinent part, "Adequacy of communication depends in part on the kind of advice or assistance involved. The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with (1) the duty to act in the client's best interests, and (2) the client's overall requirements and objectives as to the character of representation."

The Court of Appeals has found a violation of Rule 1.4(a) when the lawyer "could not even be found by his client, counsel [for the opposing party], or the court.

---

11. Mr. Greer may have been prejudiced as well. His grievance was no doubt governed by time limitations. Although Respondent drafted the grievance, he made no effort to see that it was filed or to follow up in any way.

12. Bar Counsel's Proposed Findings of Fact, etc. analyzes Respondent's conduct under Rule 1.4(b) and (c). As those charges were not included in the original charge, we will not consider them.

[He] failed not only to keep his client informed about the status of the case, but about his own intent to abandon the representation." *In re Lewis,* 689 A.2d at 565.

The instant proceeding presents a pattern of such conduct in each of the three client representations. Respondent routinely failed to keep his clients informed of developments in their respective cases. With respect to Messrs. Greer and Surratt, for example, he provided information only when they stopped by to make an installment payment on the fee. Additionally, Respondent did not contact his client to inform him of the filing of the petition in February 1997. In *Tel–Art,* Respondent failed to keep the client apprised of developments in the settlement. In early 1997, Respondent's communication with all three clients ceased when he decided to withdraw from representation of private clients. Although Respondent maintains that he informed all of his clients of his decision (Respondent's Proposed Findings of Fact, etc. at 11), we find no credible evidence to support this contention. All three clients considered Respondent to have disappeared. Additionally, Respondent failed to file the required notices with the courts and opposing counsel. Moreover, as discussed in the preceding section, Respondent's failure to inform his clients, the courts, and opposing counsel of his change of address made it all but impossible for any of them to contact him with their reasonable requests for information. Messrs. Greer's and Surratt's efforts to reach Respondent at his home proved futile, too. Accordingly, we hold that Respondent violated Rule 1.4(a).

\*     \*     \*     \*     \*     \*

F.  *Rule 1.16(a), Declining or Terminating Representation*

Respondent is charged with a violation of this rule as to all three clients. Rule 1.16(a) requires a lawyer to withdraw from representation of a client if, *inter alia,* (1) the representation will result in violation of the rules of professional conduct or other law.

Under this Rule, withdrawal from these private client representations was clearly required once Respondent accepted federal employment. Once his federal employment started, Respondent developed a pattern of neglect as to all three private clients in violation of Rules 1.1(a) and (b), 1.3(a), (b), and (c), and 1.4(a). The Committee recommends a conclusion that Respondent violated Rule 1.16(a).