**In re Betty JONES–TERRELL, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 97–BG–162.**

District of Columbia Court of Appeals.

Argued April 28, 1998.

Decided May 28, 1998.

Samuel McClendon, Washington, DC, for respondent.

Wallace E. Shipp, Jr., Deputy Bar Counsel, with whom Leonard H. Becker, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before SCHWELB and REID, Associate Judges, and MACK, Senior Judge.

---

REID, Associate Judge:

The Board on Professional Responsibility ("the Board") has recommended that respondent Betty Jones–Terrell be suspended from the practice of law for sixty days, without a fitness requirement, based on her violation of six of the Rules of Professional Conduct:

(1) Rule 4.2(a) pertaining to communication with a person known to be represented by an attorney, without the prior consent of that attorney;

(2) Rule 1.8(a) concerning conflict of interest and engaging in prohibited business transactions with a client without full disclosure or fair and reasonable terms;

(3) Rule 7.1(b)(3) prohibiting personal contact with an incapacitated person regarding potential employment as that person's lawyer;

(4) Rule 1.7(b) involving conflict of interest in the representation of persons having adverse interests;

(5) Rule 8.4(c) pertaining to dishonesty, fraud, deceit, or misrepresentation; and

(6) Rule 8.4(d) regarding conduct that seriously interferes with the administration of justice.

Respondent filed an exception only to the sanction imposed. We adopt the recommendation of the Board.

### FACTUAL SUMMARY

On October 16, 1996, Hearing Committee Ten issued a report containing proposed factual findings regarding this matter, which were adopted by the Board. We commence with a summary of those factual findings.

Respondent graduated from law school in 1983, was admitted to the Pennsylvania Bar in 1986, and to the District of Columbia Bar in 1988.[1] After her graduation from law school, she moved to an apartment located at 1715 Swann Street, N.W. She met Ruth and Isaac Long, who lived at 1749 Swann Street, and subsequently became their counsel. The Longs regarded respondent as their god-child. The Longs introduced respondent to Fred and Naomi Wallace, an elderly couple who also lived in the Swann Street neighborhood. At the time of the introduction, the Longs and the Wallaces had been friends and neighbors for almost twenty years.

Mr. Wallace was blind and seldom ventured out of the house. Mrs. Wallace was bedridden and incontinent. By 1986, the condition of Mrs. Wallace became worse. Around September of 1986, the Family and Child Services of Washington, D.C. ("FACS") began to provide assistance to the Wallaces. A social worker, Gwen Noonan–Jones, was assigned to the case. In December 1986 and again in July 1987, both Ms. Noonan–Jones and Mrs. Long contemplated the need for a conservator for the Wallaces. On July 20, 1987, Richard Lyon, Esq., who had known Mr. Wallace for years and served as the Wallaces' attorney, the Wallaces and Ms. Noonan–Jones met to plan for the continued care of the Wallaces. Instead of seeking the appointment of a conservator, Ms. Noonan–Jones and Mr. Lyon devised a plan in which Ms. Noonan–Jones would continue to make out checks for the Wallaces' signatures so that their bills could be paid, and Mr. Lyon would assume the task of reviewing the Wallaces' monthly bank statements to determine that the expenditures were proper.

On August 6, 1987, Mr. Lyon was given a power of attorney by Mrs. Wallace. He drafted reciprocal wills for the Wallaces, in which they named the Longs as the beneficiaries of the final survivor. The Wallaces executed reciprocal wills on September 10, 1987. On that same date, respondent, acting as the attorney for the Longs, drafted an agreement specifying that: "As sole beneficiaries of Fred and Naomi Wallace . . . [the Longs would] provide primary care and assistance for the remainder of the Wallace's [sic] respective lives." However, the FACS social worker, Ms. Noonan–Jones, continued to provide care and assistance to the Wallaces. In May 1988, Mr. Lyon met with the Longs, together with respondent in her capacity as counsel for the Longs, to discuss

---

1. Following her graduation from law school, respondent worked in a political campaign and became a real estate agent. Beginning around 1988 and continuing to 1991, she worked for two different law firms at different times, first in an "of counsel" position, and then as an associate.

daily and weekend care for Mrs. Wallace. After Mr. Wallace died on July 11, 1990, FACS assumed primary responsibility for the care of Mrs. Wallace. Eventually, a live-in student was hired, as well as a home care agency so that Mrs. Wallace could receive daily care.

By fall 1991, the Longs thought that Mr. Lyon was preparing to sell Mrs. Wallace's home to cover the cost of her care. The home constituted the major asset of the Wallace estate to which the Longs were heirs. As counsel for the Longs, respondent took an active interest in the matter. On November 5, 1991, Mr. Lyon and Ms. Noonan–Jones met with respondent and the Longs. The discussion centered around how to cut expenses, and the possibility of hiring a full-time, live-in caretaker. The following day, respondent informed Mr. Lyon that she and her husband were willing to move into the house with Mrs. Wallace to become her caretakers. Without Mr. Lyon's knowledge and consent, respondent discussed her proposal with Mrs. Wallace between November 5 and 12, 1991. Mrs. Wallace indicated she wanted to think about the offer.

During a November 12, 1991 meeting at the Longs' home, which included the Longs, Mr. Lyon and Ms. Noonan–Jones, respondent presented a draft agreement specifying that she and her husband would move in with Mrs. Wallace, rent-free, for one year and would care for her. Mr. Lyon rejected the agreement. Subsequently, Ms. Noonan–Jones discussed the agreement with Mrs. Wallace who said she did not want to change her current care arrangements.

On November 18, 1991, respondent and her husband went to Mrs. Wallace's home. They did not obtain permission from Mr. Lyon. Respondent's goal was to get Mrs. Wallace to sign the agreement. Her husband advised her to obtain a witness. After a neighbor arrived, the agreement was executed by Mrs. Wallace. The next day, respondent advised Mr. Lyon of the agreement and demanded Mrs. Wallace's checkbook. When Ms. Noonan–Jones spoke with Mrs. Wallace on November 27, 1991, Mrs. Wallace stated she did not recall signing any agreement.

FACS had Mrs. Wallace examined for competency on November 25. She was found to be incapable of making "rational decisions about her finances or her health, requiring sophisticated analysis."

In early December 1991, respondent and her husband moved into Mrs. Wallace's home. Respondent sent a letter signed by Mrs. Wallace to Mr. Lyon on December 10, 1991, terminating his services. He was also informed that, at Mrs. Wallace's request, respondent would represent her.

Two days later, respondent filed an intervention proceeding in Superior Court, petitioning for appointment as guardian and conservator for Mrs. Wallace. In her petition, she misrepresented her status, stating that she had been "nominated in subject's [*i.e.*, Mrs. Wallace's] durable power of attorney to be guardian and conservator." In fact, Mrs. Wallace had not executed the document giving respondent power of attorney. Respondent listed Mr. Lyon as Mrs. Wallace's "former counsel." Although respondent mentioned the Longs in her petition, she did not state that she represented them and they considered her to be their godchild. Nor did she reference the November 18, 1991, agreement executed at her request by Mrs. Wallace, which permitted respondent and her husband to live rent-free in Mrs. Wallace's home.

The court appointed an attorney and guardian *ad litem* for Mrs. Wallace, and had her examined for competency. Respondent informed the court-appointed persons that she also represented the Longs and was their godchild, but that Mrs. Wallace had waived any conflict. After the competency examination, which found Mrs. Wallace's "cognitive function [to be] extremely limited and impaired," the court appointed another attorney as Mrs. Wallace's permanent limited guardian, and conservator with control over Mrs. Wallace's financial affairs.

In 1992, Mrs. Wallace's leg had to be amputated. Without authority, on February 14, 1992, respondent made out a check to herself in the amount of $250, presented it to Mrs. Wallace for signature, and deposited it in her own checking account. Respondent indicated

that the check was for "perscriptions [sic] ambulance service."[2] The conservator and guardian filed an emergency petition on April 9, 1992, seeking an order nullifying the November 18, 1991 agreement signed by Mrs. Wallace.[3] The court granted the petition and nullified the agreement.[4]

The Board essentially adopted the findings and conclusions of the hearing committee relating to each of the violations charged. With respect to Rule 4.2(a) pertaining to communication with a person known to be represented by an attorney, without the prior consent of that attorney, the Board agreed with the conclusion of the hearing committee, which reads in part:

> While the Committee does not find that Respondent acted out of evil or corrupt intent, it does conclude that the circumstances here give good cause for suspicion about Respondent's motives.

The Board found that respondent violated Rule 1.8(a), concerning conflict of interest and engaging in prohibited transactions with a client without full disclosure or fair and reasonable terms, after December 10, 1991, while Mrs. Wallace lacked mental capacity, and when respondent became her attorney and lived in her home without paying rent. Rule 7.1(b)(3), prohibiting personal contact with an incapacitated person regarding potential employment as that person's lawyer, was violated, the Board concluded, "[b]y December 10, 1992, ... [when] it was or should have been apparent that Mrs. Wallace could not exercise reasonable, considered judgment as to the selection of her lawyer." Rule 1.7(b), involving conflict of interest in the representation of persons having adverse interests, was violated, the Board concluded, because respondent failed to disclose, or obtain Mrs. Wallace's consent to, the conflicts between her representation of Mrs. Wallace, and her representation of the Longs. The Board found that respondent violated Rule

8.4(c) pertaining to dishonesty, fraud, deceit or misrepresentations, stating *inter alia:*

> Given the significance of the Respondent's assertion that she had been nominated to be conservator and guardian and given Respondent's recent conduct in displacing Mr. Lyon as attorney for Mrs. Wallace, we find it difficult to credit Respondent's assertion that the false statement and omissions were not intentional. Even if they were, at least in part, attributable to Respondent's haste in preparing the petition, the false statement and omissions were of such significance to the issues before the court that we believe her conduct was at least reckless and sufficient to sustain a violation of the rule.

Finally, the Board concluded that respondent violated Rule 8.4(d), regarding conduct that seriously interferes with the administration of justice, "because her misrepresentations on the guardianship petition may have complicated the guardianship proceedings ... [;] when she caused Mrs. Wallace to sign a check payable to [her] for $250 at a time when [she] knew that a limited guardian and conservator had been appointed to handle Mrs. Wallace's affairs[;] [and]" because "[r]espondent's entire course of conduct surrounding the events leading up to the November 18, 1991 agreement and thereafter constituted a violation of the rule."

### ANALYSIS

■ This court " 'accept[s] the findings of fact made by the Board unless they are unsupported by substantial evidence of record.' " *In re McLain,* 671 A.2d 951, 953 (D.C.1996) (quoting *In re Micheel,* 610 A.2d 231, 234 n. 10 (D.C.1992) (other citation omitted)). Moreover, this court will "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(g)(1).

---

**2.** Although the check presumably was meant to cover the cost of ambulance transportation of Mrs. Wallace on February 14, 1992, it was made out to respondent, not the ambulance service.

**3.** The petition stated, *inter alia,* that respondent had removed Mrs. Wallace's furniture from her

house, and had induced Mrs. Wallace to sign a check in favor of respondent, after the court had appointed a conservator and when she knew Mrs. Wallace was incapacitated.

**4.** Eventually Mrs. Wallace was placed in a nursing home where she died in June 1995.

■■■■■■■■■■■■■■■■■■■■■■■■■■

■ Because the Board concluded that respondent was inexperienced; did not act out of evil or corrupt intent; and had no other rule violations; and because of the delay in the disposition of this case, respondent contends that public censure rather than a sixty-day suspension is the appropriate sanction. The Board rejected this contention. We agree with the Board's recommended sixty-day suspension, without a fitness requirement.

■ The factors we consider in deciding whether to adopt the Board's recommendation are: "the 'nature of the violation, aggravating and mitigating circumstances, the absence or presence of prior disciplinary sanctions, the moral fitness of the attorney, and the need to protect the legal profession, the courts, and the public.'" *McLain, supra,* 671 A.2d at 954 (quoting *In re Lenoir,* 604 A.2d 14, 15 (D.C.1992)).

The first factor to be considered in determining whether the proposed disposition is appropriate is the nature of the violation.[5] The violations with which respondent was charged are extremely serious. When she knew Mrs. Wallace was represented by counsel, respondent approached her without the permission of Mr. Lyon, the attorney for Mrs. Wallace. She convinced Mrs. Wallace to execute an agreement which substantially altered her living arrangement, and authorized respondent and her husband to move in rent-free. She then took on the representation of Mrs. Wallace, despite the fact that Mrs. Wallace was incapacitated and represented by Mr. Lyon, while living rent-free in her home, thus making improper contact regarding representation, and engaging in a prohibited business transaction with a client, without full disclosure, or fair and reasonable terms.

Upon assuming the representation of Mrs. Wallace, respondent was in a clear conflict of interest because she also represented the Longs, who were the beneficiaries of Mrs. Wallace's estate.[6] Even when she was advised of the clear conflict in 1992, she maintained that she had explained the conflict and that Mrs. Wallace had waived it. However, the Board found that "there was no disclosure of the conflicts and Mrs. Wallace was incompetent to give her consent to the conflict-burdened representation."

Several of respondent's representations in her petition for appointment as guardian of Mrs. Wallace and conservator of her estate obviously were false or misleading, or constituted significant omissions. There was no valid durable power of attorney naming her as conservator and guardian.[7] She failed to disclose the November 18, 1991 agreement, her representation of Mrs. Wallace and the interest of her clients, the Longs, in Mrs. Wallace's home. Moreover, as the Board stated in agreement with the Hearing Committee:

> Given the significance of the Respondent's assertion that she had been nominated to be conservator and guardian and given Respondent's recent conduct in displacing Mr. Lyon as attorney for Mrs. Wallace, we find it difficult to credit Respondent's assertion that the false statement and omissions were not intentional. Even if they were, at least in part, attributable to Respondent's haste in preparing the petition, the false statement and omissions were of such significance to the issues before the court that we believe her conduct was at least reckless....

In preparing and having Mrs. Wallace sign a $250 check after the court had appointed a conservator and given that individual control over Mrs. Wallace's finances, respondent seriously interfered with the administration of guardianship and conservatorship proceedings. Even though respondent spoke

---

5. The Board found that respondent engaged in serious misconduct.

6. Because Mrs. Wallace's home was her primary asset, she was dependent upon funds from its sale to cover the costs of her long-term care. *Contrary* to Mrs. Wallace's interest, the Longs, as beneficiaries of Mrs. Wallace's estate, were interested in inheriting the home.

7. As an attorney, respondent had to know that no power of attorney is valid unless signed. The fact that respondent prepared a durable power of attorney naming herself as conservator and guardian did not create a valid power of attorney.

with the guardian and conservator on the very day Mrs. Wallace had to be transported by ambulance, she did not seek permission to incur the cost of transportation, or to be reimbursed by having an incapacitated individual sign a check. Clearly there was substantial evidence to support the Board's findings and disposition with regard to the nature of the violation. The violations were extremely serious and akin to those in *McLain*.[8] While *McLain* is not identical to this case, it is sufficiently similar to support the appropriateness of the recommended disposition.[9]

Two other factors should be addressed with respect to the appropriateness of the Board's disposition: the aggravating and mitigating factors; and the need to protect the legal profession, the courts and the public. Mrs. Wallace was a bedridden, incontinent, incapacitated, elderly, vulnerable woman. When Mrs. Noonan–Jones spoke to her about the November 18, 1991 agreement, Mrs. Wallace did not recall signing it and indicated that she did not wish to change the arrangements for her care. The rules of professional responsibility are designed to protect persons in Mrs. Wallace's situation. The rules also are applied to protect members of the legal profession in Mr. Lyon's situation. He rendered legal services to the Wallaces, and after Mr. Wallace's death, attempted to care for the legal and financial interests of his longtime friend's wife. His efforts were ended abruptly when respondent approached Mrs. Wallace directly, without the permission of Mr. Lyon, and subsequently had Mrs. Wallace dismiss him as her attorney. In addition, the rules are designed to protect the court against false and misleading statements in petitions for guardianship and conservatorship; and against actions which ignore its orders appointing guardians and conservators.

Respondent asserts that there are mitigating factors in this case, including the lack of any other disciplinary record, her inexperience, and the delay in this matter. While respondent has no other disciplinary record, and was inexperienced when the events first began, it should be noted that she graduated from law school in 1983 and was first admitted to the Bar in 1986. The acts which are the subject of the charged violations extended from 1987 to 1992. The record before us reveals that from 1988 through most of 1991, respondent performed legal work as "of counsel" and as an associate in two different law firms. In short, while she began her practice as an inexperienced attorney, she had acquired law firm experience when she continued violating the Rules of Professional Conduct into 1991 and 1992. In *In re Williams*, 513 A.2d 793 (D.C.1986) (per curiam) (*Williams II*), we recognized delay as a mitigating factor.[10] *Id.* at 798. However, as we said in *In re Fowler*, 642 A.2d 1327

---

8. The respondent in *McLain, supra,* was given a ninety-day suspension, rather than a sixty-day suspension. He was charged with, *inter alia,* "conflicts of interest with a client ... and conduct involving fraud, deceit and misrepresentation." 671 A.2d at 952. The Board considered McLain's conduct to be more serious than that of the respondent in this case. He borrowed $21,500.00 from two of his clients. We said in *McLain* that: "Sanctions for similar conduct have ranged from a public censure to a one-year suspension." *Id.* at 954. Here, respondent has been charged with serious misconduct violations of several rules, including those involving conflict of interest; and dishonesty, fraud, deceit, or misrepresentation. Moreover, her misconduct extended over a period of years.

9. Respondent relies on *In re Austern*, 524 A.2d 680 (D.C.1987), in arguing that a public censure is the appropriate sanction in this case. However, the violations charged in *Austern* concerned no elderly, bedridden, vulnerable, or incapacitated person. Moreover, respondent's misconduct there did not extend over a period of years; and respondent did not file false and misleading statements in the court.

10. Formal charges against respondent Williams were commenced in 1979 and 1980. In 1983, we declined to impose the sanction recommended by the Board, and remanded the matter on due process grounds. *In re Williams*, 464 A.2d 115 (D.C.1983) (per curiam) (*Williams I*). After remand and following a delay of eighteen months, the identical charges were refiled against the respondent. The hearing committee in that case found four of the five charges to be unsupported by clear and convincing evidence, and called the delay "inexcusable." Nonetheless, we said: "Without condoning the delay which took place in this case, we hold that dismissal of disciplinary proceedings is an inappropriate remedy when allegations of attorney misconduct remain unresolved." *Williams II, supra,* 513 A.2d at 798. However, delay may be considered in mitigation "if the attorney has ethically

(D.C.1994): "[T]he circumstances of the individual case must be sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." *Id.* at 1331. The circumstances here are not sufficiently unique or compelling to dispose of this case by public censure, instead of a sixty-day suspension. The delay here generally is not attributable to Bar Counsel, as it was in *Williams II, supra.* Unfortunately, in this case, respondent's first counsel died before he was able to represent her at the hearing committee level. However, much of the delay in respondent's case was attributable to working out mutually agreeable hearing dates. In short, we agree with the Board that this is not the type of case where delay should be treated as a mitigating factor. Indeed, the aggravating factors here outweigh the mitigating factors claimed by respondent.

We conclude that the sanction imposed by the Board, a sixty-day suspension, without a requirement of fitness, would not foster a tendency toward inconsistent dispositions for comparable conduct, and would not be unwarranted. *See McLain, supra.* Accordingly, we order the suspension of Betty Jones–Terrell for a period of sixty days. Respondent's attention is drawn to D.C. Bar R. XI, § 14(g) and § 16 regarding the required filing of an affidavit and the effect on reinstatement of the failure to file that affidavit.

*So ordered.*

practiced law during the period in question."