In re Billy L. PONDS, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 379883).

No. 04–BG–27.

District of Columbia Court of Appeals.

Argued April 7, 2005.
Decided Dec. 15, 2005.

Danny C. Onorato, Washington, DC, for respondent.

Elizabeth A. Herman, Senior Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel at the time the brief was filed, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before TERRY and RUIZ, Associate Judges, and KING, Senior Judge.

KING, Senior Judge:

The Board on Professional Responsibility ("Board") determined that respondent, Billy L. Ponds, violated Maryland Rules of Professional Conduct[1] 1.7(b)[2] and 1.16(a)(1).[3] It recommends . a sixty-day suspension and "in view of the very lengthy [five-year] delay in the disposition of this case" that execution of the sixty-day suspension be stayed with a six-month period of unsupervised probation, with the requirement that Ponds complete a continuing legal education course on ethics or

---

1. Rule 8.5(b)(1) of the District of Columbia Rules of Professional Conduct provides that, "[f]or conduct in connection with a proceeding in a court before which a lawyer has been admitted to practice ... the rules to be applied shall be the rules of the jurisdiction in which the court sits ...." Rule 8.5(a) provides, in relevant part, that "[a] lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs."

2. Maryland Rule of Professional Conduct 1.7(b) provides, in relevant part, that a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third party, or by the lawyer's own interests.

3. Maryland Rule of Professional Conduct 1.16(a)(1) provides, in relevant part,˙ that a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation if the representation will result in a violation of the rules of professional conduct.

criminal practice covering conflicts of interest.[4]

Respondent maintains that his conduct did not violate Maryland Rules of Professional Conduct 1.7(b) or 1.16(a)(1). Bar Counsel takes the opposite view and requests that we adopt the Board's findings of fact and conclusions of law with respect to the violations. Bar Counsel, however, takes issue with the recommended sanction and asks that we reject the Board's recommended stay of the suspension and instead order a sixty-day suspension to commence thirty days after the entry of our order. The Board, which has filed its own brief addressing only the sanction issue, asks that we impose the recommended sanction. Respondent did not address the issue relating to the sanction in his briefs nor did he request, in his filings before the Board, that any sanction imposed be mitigated because of the delay.

We accept the Board's findings of fact and conclude that respondent did indeed violate Maryland Rules of Professional Conduct 1.7(b) and 1.16(a)(1). We reject, however, the Board's sanction recommendation, as well as its decision to mitigate it due to the delay in the disposition of this case. Accordingly, we conclude that respondent shall be suspended from the practice of law for a period of thirty days

and shall complete appropriate CLE in light of this opinion.

## I.

Respondent, who has been a member of the bar for approximately twenty years, was retained on February 8, 1997 to represent Gifford Thompson. Thompson had been charged, in the United States District Court in Maryland, with conspiracy to import cocaine and conspiracy to distribute and possess with the intent to distribute between 15 and 50 kilograms of cocaine.[5]

On July 10, 1997, Thompson sought to enter a guilty plea to the charge of conspiracy to import cocaine. The judge conducted a thorough Rule 11(b) inquiry and accepted Thompson's guilty plea. On approximately July 21, 1997, Thompson sent respondent a letter accusing respondent of coercing him into pleading guilty, but also requesting respondent's assistance with withdrawing the guilty plea.[6] On approximately August 13, 1997, the District Court received a letter from Thompson, with a copy of the letter he had sent to respondent attached, requesting a hearing on his request to withdraw the guilty plea.

The court forwarded Thompson's letter to government counsel and to respondent and asked respondent for his response. Respondent replied, in a letter dated Sep-

---

4. The Board's Report, dated January 22, 2004, addresses the appropriate sanction in this case. This opinion also refers to the Board's previous report, dated July 31, 2003, which dealt with whether respondent's conduct violated Maryland's Rules of Professional Conduct.

5. Thompson was charged pursuant to 21 U.S.C. §§ 846 and 963.

6. In his letter, Thompson also requested that respondent return his $14,000 retainer. Bar Counsel argued to the Board that it should require respondent to pay Thompson $14,000 in restitution. We agree with the Board that

"[a] restitution determination in this case, where the record establishes that the Respondent provided substantial services to his client, would not be possible, because the record includes no billing records, affidavits, or other materials necessary to such a determination." The Board also points out that in its report issued in July 2003, it gave the parties the opportunity to request a remand to the hearing committee, upon a showing of good cause, for any further fact finding they considered necessary and that neither party requested a remand. For these reasons, we adopt the Board's recommendation that restitution not be ordered.

tember 10, 1997, "in light of the fact that I still represent Mr. Thompson, I believe that it would be inappropriate to respond at this time [to the allegations]." Although he did not meet with Thompson between the date he received Thompson's letter requesting withdrawal of the guilty plea and the September 26, 1997 sentencing date, respondent continued preparing for the client's sentencing hearing.[7]

At the beginning of the sentencing hearing, the following exchange took place between the court and respondent:

COURT: Mr. Ponds, are you arguing . . . [the motion to withdraw the plea] yourself on his behalf or how are you going to proceed with that?

MR. PONDS: No, Your Honor. I think it would be inappropriate for me to argue the motion since there's things in his motion that . . . .

COURT: All right. Well, Mr. Thompson, I will let you further address me.

The court then asked Thompson why it should allow him to withdraw his plea. Thompson replied that respondent had told him about the plea offer only fifteen or twenty minutes before he pled guilty and that respondent had advised him that if he did not take that offer, he was going "to get life" imprisonment. He then stated that respondent had intimidated him and lied to him and that he did not trust respondent. After hearing from Thomp-

son, the court denied Thompson's request to withdraw his guilty plea, observing:

But I don't think, Mr. Thompson, that you have established your burden to withdraw your guilty plea. I can't withdraw a guilty plea when I went through a half hour questioning with you and you satisfied me on the record that you made a knowing and voluntary plea, and there is absolutely no way under the law that I can withdraw your guilty plea. I can't do it and won't do it. And I am going to deny your *pro se* motion that you have filed.

The court then proceeded with the sentencing hearing.

At the sentencing portion of the hearing, respondent made representations on behalf of Thompson, and Thompson also spoke on his own behalf.[8] In his allocution, Thompson refused to accept responsibility for his crime, effectively ensuring that his offense would be considered at level 38. The court then found Thompson's offense level to be 38 and sentenced him, at the lowest end of the guideline range, to 292 months.

At the conclusion of the hearing, the court advised that Thompson had 10 days to note his appeal, but no notice of appeal was filed within that time frame.[9] On November 4, 1997, Thompson wrote a letter to the United States Court of Appeals for the Fourth Circuit advising them that he wanted to appeal his case but that he did not have counsel to help him do so.

---

7. On September 9, 1997, respondent filed exceptions to the Presentence Report. On September 19, 1997, the government filed its opposition to his client's request to vacate his guilty plea. The government served respondent with a copy, and he shared it with the client on the day of the sentencing hearing.

8. Respondent asked the court to give Thompson a three point reduction for "acceptance of responsibility" from a level 38 to a level 35. *See* U.S.S.G. § 3E1.1 (a) and (b). In the

alternative, respondent requested that the court sentence Thompson to the low end of the sentencing range for level 38.

According to the Board's first report, if Thompson had gone to trial, the worst case sentencing scenario for him would have been a level 38 offense which would fall within a guideline range of 292 months to 365 months.

9. The record does not indicate the reason respondent did not note an appeal.

The Court of Appeals treated the letter as a Notice of Appeal.

Although Thompson's letter to the Fourth Circuit also contained accusations that respondent had coerced Thompson into accepting a plea, the Court of Appeals appointed respondent, on December 4, 1997, to represent Thompson in his appeal. On December 24, 1997, the Court of Appeals sent a letter to respondent advising him of his failure to file a docketing statement, transcript purchase order and counsel of record form. On December 31, 1997, respondent filed a motion for enlargement of time to file the docketing statement and subsequently filed it with the court. On January 5, 1998, Thompson sent another letter to the court requesting the appointment of new counsel. Respondent filed a response on January 20, 1998 stating that he had no objection to the request. Thompson was appointed new counsel on February 19, 1998.[10]

## II.

Respondent testified before the hearing committee and the committee credited his testimony that: (1) Thompson's claim that respondent coerced him into pleading guilty was baseless; (2) respondent did not interpret Thompson's July 21, 1997 letter as a discharge; (3) respondent believed that Thompson's pursuit of a motion to withdraw the guilty plea could have subjected Thompson to additional charges of perjury and or interference with the administration of justice which could have resulted in an even longer sentence; and (4) respondent decided not to take a position with regard to Thompson's motion to withdraw his plea in order to avoid being called as a witness against his client and to avoid facilitating his client's perjury.

The Board agreed with the hearing committee that Thompson's letter dated July 21, 1997 did not indicate an intent to terminate the representation with sufficient clarity to support a violation of Maryland Rule of Professional Conduct 1.16(a)(3) (failure to withdraw when discharged). The Board did conclude, however, that respondent violated Maryland Rule of Professional Conduct 1.7(b) (conflict of interest). The Board noted that an attorney cannot "jump in and out of a representation as it suits that attorney's needs or purposes" and that, because respondent had not withdrawn from representing Thompson, he was still Thompson's attorney and was therefore "operating under an actual conflict of interest during the hearing on the plea withdrawal as his client . . . had accused him, in so many words, of coercion and ineffective assistance which made his guilty plea involuntary." Having found that respondent had a conflict of interest, the Board then concluded that respondent also violated rule Maryland Rule of Professional Conduct 1.16(a)(1) (lawyer shall withdraw from representation of a client if the representation will

10. In her brief, Bar Counsel brings to our attention a motion to vacate sentence which Thompson filed pursuant to 28 U.S.C. § 2255. It appears that the Board was not aware of this motion at the time it made its recommendations.

Thompson's motion was based on two claims: (1) respondent's ineffective assistance of counsel rendered his guilty plea involuntary and unknowing; and (2) once Thompson filed his motion to withdraw his guilty plea, respondent's representation was ineffective because of the conflict of interest. After a two-day evidentiary hearing on Thompson's claims, the parties reached an agreement. In exchange for an approximately nine-year reduction in his sentence, Thompson agreed to withdraw his claim that his guilty plea was involuntary thus obviating the need for the court to rule on the second claim regarding respondent's alleged conflict of interest. The United States Court for the District of Maryland entered a consent order, memorializing the parties' agreement, on October 2, 2003.

result in a violation of the Rules of Professional Conduct) because "it is clear that lawyers must withdraw where their client's interests are in conflict with their own professional or personal interests."

Respondent maintains that the Board erred in concluding that his conduct violated Maryland Rules of Professional Conduct 1.7(b) and 1.16(a)(1).[11] The thrust of respondent's argument is that he did not have a conflict of interest with his client and therefore was not required to withdraw from the representation. He claims there was no conflict because "he had no interests of his own to advance by staying in the case after Thompson indicated that he wished to withdraw his guilty plea." Alternatively, respondent contends that even if he did have a conflict, the court "implicitly ordered Respondent to remain in the case." Thus, even though there were grounds for withdrawal, under Maryland Rule of Professional Conduct 1.16(c), respondent had to continue to represent Thompson.[12] We disagree on both points.

■ Maryland Rule of Professional Conduct 1.7(b) provides, in relevant part, that a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third party, or by the lawyer's own interests.

We agree with the Board that, in these circumstances, respondent's representation of Thompson was materially limited by his own interests. Because Thompson alleged coercion and ineffective assistance of counsel as grounds for his motion to withdraw his guilty plea, respondent could not argue the motion to withdraw without possibly admitting serious ethical violations and subjecting himself to possible liability for malpractice. As a result, due to the conflict, Thompson was unrepresented by counsel on the issue relating to the request to withdraw the guilty plea.

■ Having concluded that respondent's representation of Thompson was materially limited by his personal interests, we further conclude that respondent was obligated to withdraw as counsel under Maryland Rule of Professional Conduct 1.16(a)(1),[13] and failed to do so. Maryland Rule of Professional Conduct 1.16(a)(1) provides, in relevant part, that a lawyer shall withdraw from representation if the representation will result in a violation of the rules of professional conduct. In this case, since respondent had a conflict of interest, in violation of Maryland Rule of Professional Conduct 1.7(b), it was mandatory that he withdraw under Maryland Rule of Professional Conduct 1.16(a)(1).[14]

11. We are required to "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record ...." D.C. Bar R. XI, § 9(g).

12. Maryland Rule of Professional Conduct 1.16(c) provides: "When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation."

13. Because we have concluded that respondent did indeed have a conflict under Maryland Rule of Professional Conduct 1.7(b) we do not address an argument, made by respondent, that since he did not in fact have a conflict, his withdrawal was not mandatory and instead he had the option to withdraw under Maryland Rule of Professional Conduct 1.16(b) if withdrawal could "be accomplished without material adverse effect on the interests of the client ...."

14. Respondent also argues, for the first time before this court, that Thompson's failure to request a new attorney at the sentencing hearing demonstrates "that Mr. Thompson waived any conflict of interest between himself and respondent prior to sentencing and during the sentencing hearing." We note that "[j]ust as in an appeal from a trial court or an administrative agency, a disciplinary proceeding before this court is not the appropriate occasion to raise an issue for the first time." *In re*

Finally, respondent maintains that "[t]he Court's actions by first allowing Mr. Thompson to proceed *pro se* without appointing new counsel in a separate motions hearing and allowing respondent to represent Mr. Thompson at sentencing ... [suggests] that the Court had implicitly ordered or sanctioned respondent's continued representation of Mr. Thompson ...." We agree with the Board that respondent cannot shift the responsibility for withdrawal in this case to the court. The Rules of Professional Responsibility impose the responsibility to determine whether a conflict exists and to act accordingly on the attorney.[15] That responsibility requires, at a minimum, that in a court proceeding the attorney unequivocally inform the court and client of the conflict and the duty to withdraw imposed by the ethical rules. Only if, after such disclosure, the court were to expressly order the attorney to continue representation might the attorney arguably be excused from the obligation to withdraw.

### III.

Having determined that respondent violated Maryland Rules of Professional Conduct 1.7(b) and 1.16(a)(1), we now turn to

the Board's recommendation that we stay the suspension in this case "in view of the very lengthy [five-year] delay in the disposition of this case"[16] and that execution of the sixty-day suspension[17] be stayed with a six-month period of unsupervised probation, and with the added requirement that respondent complete a continuing legal education course. The Board noted, "[w]e are, of course, mindful of the Court's rule that circumstances must be 'unique and compelling' for delay to become a mitigating factor."[18] It then concluded, however, that "the five-year delay in this case rises to that level" finding that "[a] delay of this length places this case in an exceptional category, at the outermost bounds of known delays within the disciplinary system, and we believe that the *Fowler* rule allows for mitigation in these circumstances."[19] After considering the relevant case law, we conclude that the circumstances here were not sufficiently unique and compelling as to warrant reducing the sixty-day suspension to what is, in effect, no suspension at all.

A.  Case law

The first case in which we approved the use of delay as a mitigating factor was *In*

*Zaukovich*, 831 A.2d 964, 972 (D.C.2003). Thus we reject that argument.

15.  In many cases, only the attorney, because of the nature of attorney-client privilege, is aware of all of the facts necessary to determine whether a conflict exists.

16.  The five-year delay in this case is largely attributable to the hearing committee taking more than three years to issue its report.

17.  We discuss the appropriateness of the recommended sanction *infra* in part IV.

18.  In *In re Fowler*, this court held that in order for a delay to warrant reducing a sanction, the circumstances of the individual case must be sufficiently unique and compelling.

642 A.2d 1327, 1331 (D.C.1994). See discussion *infra*.

19.  The Board also took into consideration "the fact that the Respondent has practiced law ethically during the pendency of this matter." At the time the Board made its decision, however, it was unaware that Bar Counsel had filed new charges against respondent.

We considered the Board's report with respect to those new charges and concluded that respondent violated Rule 1.6 of the Maryland Rules of Professional Conduct when he improperly disclosed a client's confidential information in a motion to withdraw as defense counsel. *In re Ponds*, 876 A.2d 636 (D.C.2005). We agreed with the Board's recommendation that a public censure was an appropriate sanction.

re Williams, 513 A.2d 793 (D.C.1986) (*Williams II*). Bar Counsel brought disciplinary charges against Williams in 1979 and 1980. *Id.* at 794. Three years later, we remanded the case back to the Board because we concluded Williams had not been afforded adequate due process protections. *In re Williams,* 464 A.2d 115 (D.C.1983) (*Williams I*).

Eighteen months later, Bar Counsel refiled identical allegations of misconduct against Williams. *Williams II,* 513 A.2d at 794–95. Williams, in turn, argued that the eighteen-month delay warranted dismissal of the charges for lack of a speedy hearing. The Board accepted Williams' argument and dismissed the disciplinary proceedings. *Id.* at 795.

In considering the application of the requirement of a speedy trial to attorney discipline cases, we determined that "[s]peedy trial principles, which in criminal cases are a constitutionally required curb on the abuse of government power, in the disciplinary system take second place to other societal interests." [20] *Id.* at 796. We concluded that "[a]ny betrayal of the trust which the attorney is sworn to keep demands appropriate discipline[,] a delay in prosecution, *without more,* cannot override this necessity[,] ... [and that] an undue delay [21] in prosecution is not in itself a proper ground for dismissal of charges of attorney misconduct." [22] *Id.* (emphasis added).

The issue of delay arose again in *In re Hessler,* 549 A.2d 700 (D.C.1988) where the Board considered delay as a mitigating factor in recommending "a sanction nearer the lesser end of the permissible range for the type of misconduct involved." [23] *Id.* at 716. The Board, after taking several mitigating factors into account, including an approximately two-year delay in the disciplinary process, recommended a one-year suspension.[24] *Id.* at 716–17. We conclud-

---

20. We also noted that other courts have agreed that delay in prosecution is not grounds for dismissal and quoted the following from the Supreme Court of Oregon:

> It ought to be made clear ... that the primary purpose of professional disciplinary proceedings is to protect the public. The punishment of the offending member of the profession is indeed a serious matter, but it is incidental to the protection of the public. If the conduct of a member of the bar disqualifies him [or her] from the practice of law, it would not be in the public interest to dismiss the disciplinary proceedings for no reason other than the Bar's failure to prosecute them with the proper dispatch.

> *Id.* at 797 (citing *In re Weinstein,* 254 Or. 392, 459 P.2d 548, 549 (1969) (per curiam), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1689, 26 L.Ed.2d 61 (1970) (other citations omitted)).

21. This court also noted that treating the lapse of time as a possible mitigating factor is "a particularly suitable approach if the attorney has ethically practiced law during the period" of delay. *Id.* at 798 (citations omitted).

22. We also noted that "[w]e might hold differently if respondent had shown that the undue delay impaired his defense. A delay coupled with actual prejudice could result in a due process violation, in which case we would be unable to agree with a finding that misconduct had actually been shown." *Id.* at 797 (citations omitted).

23. Sanctions for misappropriation and commingling of client funds, which were the violations in *Hessler,* ranged anywhere from a six-month suspension to disbarment. *Id.* at 701, 714–16.

24. In addition to the delay, the Board in *Hessler* also considered the following mitigating factors: (1) respondent had no history of prior discipline; (2) respondent had cooperated fully throughout the proceedings; (3) the client did not suffer any financial harm; (4) the misconduct occurred when respondent was a sole practitioner with very little administrative assistance with financial matters; and (5) since the conduct occurred, respondent had taken corrective steps by joining a law firm where he no longer had accounting or financial responsibilities. *Id.* at 716.

ed, "under all the circumstances of this case and in particular the numerous mitigating factors, the purposes of bar disciplinary determinations will be sufficiently served by a suspension of six months."[25] *Id.* at 703.

After *Hessler*, we again confronted the issue of delay in *In re Schneider*, 553 A.2d 206 (D.C.1989). There, the Board recommended a six-month suspension because Schneider violated Rule 1–102(A)(4) (dishonesty) by altering receipts in an effort to obtain reimbursement from his firm for his business expenditures.[26] *Id.* at 207. Because there were "a number of significant mitigating factors" including the fact that the "disciplinary process ha[d] dragged on into its sixth year," we concluded that a thirty-day suspension would better serve "the considerations that shape Bar disciplinary determinations ...."[27] *Id.* at 212.

On the same day this court decided *Schneider*, we also decided *In re Miller*, 553 A.2d 201 (D.C.1989), another case involving delay as a mitigating factor. Miller was also charged with violating Rule 1–102(A)(4) (dishonesty). *Id.* The Board recommended a one-year suspension. *Id.* at 203. We concluded that the appropriate sanction was a thirty-day suspension noting that "we think the delay ... in this case [six years] warrants a less severe sanction than that recommended."[28] *Id.* at 206.

The next case in which we considered delay as a mitigating factor was *In re Fowler, supra* note 18, 642 A.2d at 1327.[29] The Board recommended that Fowler be suspended for thirty days and that execution of the sanction be suspended due to the delay.[30] *Id.* at 1328. In imposing the thirty-day suspension, without a stay, we noted that

25. Another reason for our imposition of a lesser suspension than was recommended by the Board was our conclusion that the Board: (1) may have erred in applying the rule set forth in *In re Hines*, 482 A.2d 378 (D.C.1984) to Hessler because *Hines* was not decided until after the events which led to the disciplinary action against Hessler; and (2) even if the rule set forth in *In re Hines* applied to the *Hessler* case, the Board had misinterpreted our holding. 549 A.2d at 703. We noted that the Board's report suggested that, "absent the signal that it interpreted *Hines* to send, a six-month suspension would have been felt appropriate." *Id.*

26. As we noted in our opinion, Schneider did not alter the receipts for personal gain but rather to receive reimbursement for legitimate expenditures for which he had failed to save the proper receipts. *Id.* at 209–10.

27. Other mitigating factors we considered were: (1) Schneider's remorse; (2) that Schneider had learned a great deal from the experience; (3) his full cooperation with Bar Counsel; (4) his unsullied record in the six years after the offense; and (5) the fact that Schneider was a new attorney at the time the

offense occurred, and that "his indoctrination into the firm's financial procedures had been shortcut by circumstances." *Id.* at 212.

28. We also considered several other mitigating factors. Specifically, we concluded that because "the Board should have considered respondent's alcoholism and [her] perceptions of racism and sexual harassment as mitigating factors, we necessarily conclude that the recommended sanction is excessive." *Id.* at 204. Another mitigating factor this court considered was the fact that Miller had practiced law, in the interim, without incident. *Id.* at 206.

29. In *Fowler*, the Board found that after being retained (and paid) to file a motion for a new trial in a case involving two felony convictions, Fowler not only intentionally failed to file the appropriate motions, but refused to return the fee upon demand. *Id.* at 1328.

30. Approximately five years elapsed between Bar Counsel's Petition instituting formal charges and the case coming before this court. *See id.* at 1329. Much of the delay, however, was attributable to Fowler. *Id.* at 1329–30.

[w]hile we do not venture to opine under what circumstances time delay may properly mitigate an otherwise appropriate sanction, we do express the view that the circumstances of the individual case must be sufficiently *unique and compelling* to justify lessening what would otherwise be the sanction necessary to protect the public interest.

*Id.* at 1331 (emphasis added). We also noted that "[w]hatever may be the unique and compelling circumstances sufficient to mitigate an otherwise appropriate disciplinary sanction necessary to protect the public interest, none such exist here." *Id.*

In *In re Starnes,* 829 A.2d 488 (D.C. 2003), we again considered the use of delay as a mitigating factor. The Board recommended that "although a nine-month suspension has been imposed in somewhat similar cases, we conclude that six months is sufficient to protect the public in this case, in light of Respondent's repentant attitude and the significant delay in the preparation of the Hearing Committee's report in this case."[31] *Id.* at 490 n. 3. Starnes argued for a further reduction of the suspension, but "we [were not] persuaded that the delay in concluding his disciplinary proceeding [had] prejudiced Starnes materially or justifie[d] a reduction of his sanction beyond the consideration that the Board's recommendation already show[ed]." *Id.* at 490.

■ We also considered delay as a mitigating factor in *In re Brown,* 851 A.2d 1278 (D.C.2004). The Board recommended that Brown be suspended for one year with a fitness requirement for reinstatement. *Id.* at 1279. The Board noted:

under ordinary circumstances, it would have recommended a three year suspen-

sion. However, given the length of time that the case was pending, through no fault of Brown, and Brown's interim suspension pending final determination, . . . [it] recommended this case as an appropriate one for lessening of sanction.

*Id.* at 1280 (citation omitted). Neither Brown nor Bar Counsel filed objections or exceptions to the Board's report.[32] *Id.* at 1279. We concluded that the recommendation of the Board should be adopted. *Id.*

Finally, most recently in *In re Thyden,* 877 A.2d 129 (D.C.2005), we considered Thyden's claim that the delay in resolving his disciplinary matter warranted dismissal of all charges, or, alternatively, no suspension of his license to practice. We held that Thyden should be suspended for thirty days as recommended by the Board because no prejudice resulted, since he was able to practice law while the matter was being litigated and he did not demonstrate "any meritorious argument challenging the substance of the proceedings." *Id.* at 140, 145.

In sum, we have permitted mitigation of a sanction, in part, because of delay in five cases (*Hessler*; *Schneider*; *Miller*; *Starnes*, and *Brown*). In each case the attorney was suspended, and in each case the length of the suspension was reduced to a shorter period of time. In no case have we essentially eliminated a suspension because of delay.

## B. Analysis

■ By reducing a sixty-day suspension to what is, in effect, no suspension at all, the Board has essentially wiped out the sanction entirely. In *Fowler,* we made clear that "the circumstances of the indi-

---

**31.** The length of the delay is not clear from our opinion or the Board's attached report.

**32.** "In such circumstances our review of the Board's recommendation is 'especially deferential.'" *Id.* at 1279 (citation omitted).

vidual case must be sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." 642 A.2d at 1331. We conclude that the Board erred in considering the circumstances in this case to be sufficiently unique and compelling to warrant the effective elimination of the sanction. The very fact that respondent never raised the issue of delay at any point in this proceeding demonstrates that there is nothing particularly unique and compelling about the delay in this case. Furthermore, respondent does not assert that he suffered any prejudice as a result of the delay.[33] As was the case in *Fowler*, "[w]hatever may be the unique and compelling circumstances sufficient to mitigate an otherwise appropriate disciplinary sanction necessary to protect the public interest, none such exists here." *Id.*

In all of the cases where we have reduced a sanction because of delay, there were additional mitigating factors which warranted the reduction. In the case before us, there are no additional legitimate mitigating factors.[34] As the Board itself said in its report, "[i]n the final analysis, we find nothing unusually persuasive or compelling in the ... mitigating factors adduced by the parties." In light of the fact that there are no additional mitigating factors, the Board should not have reduced the recommended suspension in this case to the extent it did. Furthermore, as we noted above, in the cases where we have agreed with the Board that the circumstances of the delay were sufficiently unique and compelling to warrant a reduction in sanction, the sanction (in every case a suspension) was always reduced to a shorter period of time, not reduced to where it is effectively no suspension at all, as the Board recommends here.[35]

In sum, considering the absence of any asserted prejudice and the lack of any other mitigating factors, we conclude the circumstances here were not sufficiently unique and compelling to justify the reduction of the suspension from sixty days to essentially no suspension at all. As we noted in *Williams II, supra*, "[a]ny betrayal of the trust which the attorney is sworn to keep demands appropriate discipline ... [and] a delay in prosecution, ... cannot override this necessity." 513 A.2d at 796.

## IV.

■ Having concluded that delay alone does not warrant a stay of the entire suspension, we now consider whether the Board's recommended sixty-day sanction is appropriate in these circumstances.[36] We

---

**33.** See *supra* note 22 (describing how a delay in the proceedings and a claim of prejudice may result in a due process violation).

**34.** The Board considered one additional mitigating factor—the absence of other discipline during the pendency of this matter. However, as discussed *supra* note 19, respondent was publicly censured for conduct occurring during the pendency of this matter.

**35.** *See Hessler, supra*, 549 A.2d at 703, 717 (reducing a one-year suspension to a six-month suspension); *Schneider, supra*, 553 A.2d at 208, 212 (reducing a six-month suspension to a thirty-day suspension); *Miller, supra*, 553 A.2d at 203, 206 (reducing a one-

year suspension to a thirty-day suspension); *Starnes, supra*, 829 A.2d at 489–90 (reducing a nine-month suspension to a six-month suspension); *Brown, supra*, 851 A.2d at 1280 (upholding the Board's decision to reduce a three-year suspension to a one-year suspension because of the delay and respondent's interim suspension pending the final determination in the case).

**36.** The Board noted that "the parties are not far apart in their respective recommendations as to the appropriate sanction ... Bar Counsel recommends 'a short suspension with restitution' and [t]he [r]espondent argues for 'reprimand, censure, or in the alternative a

conclude, based on our review of the relevant case law and the conduct at issue in this case, that a shorter period of suspension is warranted after considering the effect of the delay and respondent's recent public censure.[37]

In deciding on a sixty-day sanction, the Board noted that the conduct in this case was similar, in terms of seriousness, to the conduct in *In re McLain,* 671 A.2d 951 (D.C.1996), and *In re Butterfield,* 851 A.2d 513 (D.C.2004). In *McLain,* we ordered a ninety-day suspension for a violation of the predecessor to Rule 1.8(a) (conflict of interest to enter into a business transaction with a client).[38]  671 A.2d at 954. In *Butterfield, supra,* 851 A.2d at 514, we ordered a thirty-day suspension for a viola-

tion of Rule 1.7(b)(1) (cannot represent two clients, with adverse interests, in the same matter) and (b)(2) (cannot represent a client if representation will be adversely affected by representation of other client).[39]  In respondent's case, the Board concluded that, "[l]ike McLain, the Respondent here failed to bring a conflict of interest and the need for disinterested legal advice promptly and adequately to the attention of his client.  Like Butterfield, the Respondent persisted in a representation that was too fraught with conflict to continue."  The Board then concluded, "the present case is comparable in terms of seriousness to *McLain* and *Butterfield* and hence amenable to a suspension of 60 days in ordinary circumstances." [40]

thirty (30) day suspension with supervision, held in abeyance for a six month probationary period.' "

**37.**  See *supra* note 19.

**38.**  Mr. and Mrs. Loeb were long time clients of McLain's firm.  671 A.2d at 953.  McLain became friends with Mrs. Loeb and accepted a $21,500 loan from the Loebs.  *Id.* Although, at the time of the loan, McLain represented the Loebs in an ongoing attorney-client relationship, he never advised them that his interests might be different from theirs with respect to the loan.  *Id.* He also never explained the language of the promissory note and never recommended that another lawyer review the note.  *Id.* When the Loebs requested repayment of the loan, McLain did not repay it. *Id.*

Three years later, McLain requested another loan so that he could buy a house.  *Id.* The Loebs refused to lend him the money and instead offered to buy the house for McLain and agreed to let him live in the house and pay monthly installments to the Loebs.  *Id.* Again, McLain did not advise the Loebs that their interests were not aligned or that they should seek legal representation.  *Id.* When McLain stopped acting in accordance with their agreement, the Loebs retained new counsel and sued him.  *Id.*

The Board recommended a ninety-day sanction for McLain's violations of the rules regarding conflict of interest, misrepresenta-

tion of firm name, and the use of firm letterhead.  *Id.* at 952.  We agreed with the Board's recommendation.  *Id.* at 954.

**39.**  Butterfield worked for a small firm.  He agreed to represent Raytheon in a protest against the FAA's decision to grant a government contract to Lockheed.  Two of respondent's partners at the firm already represented Lockheed on separate unrelated matters.  Even though, within two days of agreeing to represent Raytheon, respondent was informed that the firm represented Lockheed, he continued to work on the bid protest until it was filed a month later.

The Board recommended a thirty-day suspension.  *Butterfield, supra,* 851 A.2d at 514. We accepted the recommendation, noting that in this case [respondent] failed to make a preliminary check, and further failed to take action once he was fully aware of the conflict.  More specifically, he failed to notify the affected parties and attempt to obtain waivers or, failing that, to withdraw from representation of the new client.  *Id.*

**40.**  Importantly, in this case, the only aggravating factor considered by the Board was a previous informal admonition issued in 1994 for failure to communicate adequately with a client.  The Board noted, "[i]n the final analysis, we find nothing unusually persuasive or compelling in the aggravating and mitigating factors adduced by the parties."

We will "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(g)(1). *In re Jones–Terrell*, 712 A.2d 496 (D.C.1998), is the only other conflict of interest case in which a sixty-day suspension was imposed. In our view, the conduct in this case is not comparable to the egregious conduct of the attorney in that case, and therefore a sixty-day suspension is excessive and would lead to inconsistent dispositions.

In *In re Jones–Terrell*, the lawyer represented the Longs, who were the beneficiaries of the final survivor of Mr. and Mrs. Wallace.[41] When Mr. Wallace died, Mrs. Wallace's attorney decided to sell the home in order to cover the cost of Mrs. Wallace's care. *Id.* Jones–Terrell proposed to Mrs. Wallace's attorney that she and her husband would take care of Mrs. Wallace in exchange for living in her home rent free. When the attorney rejected the offer, Jones–Terrell met with Mrs. Wallace, without her attorney present, and obtained Mrs. Wallace's signature on the agreement.[42] *Id.*

Subsequently, Jones–Terrell sent a letter to Mrs. Wallace's attorney, signed by Mrs. Wallace, terminating his services and informing him that she would be representing Mrs. Wallace. *Id.* Around the same time, Jones–Terrell also filed a petition for guardianship in Superior Court in which she lied and said that Mrs. Wallace's

durable power of attorney nominated her to be Mrs. Wallace's guardian and conservator. *Id.* In addition, Jones–Terrell mentioned nothing in the petition about her relationship to the Longs—the heirs to the estate. *Id.* The Superior Court denied Jones–Terrell's petition, and appointed a different guardian *ad litem* for Mrs. Wallace.[43] *Id.*

We agreed with the Board's recommended sixty-day suspension. *Id.* at 500. Jones–Terrell was found to have violated several ethical rules including those involving conflict of interest, contacting a represented party, fraud and dishonesty. *Id.* at 499. We noted that (1) Jones–Terrell had engaged in a clear conflict and had essentially lied to the guardian about disclosing the conflict and obtaining a waiver; (2) several of Jones–Terrell's representations in her petition for appointment as guardian were false; (3) and her efforts to convince an incapacitated woman to sign documents and make out checks was deplorable. *See id.* at 500–01. We also observed that the rules were designed to protect the very people who were victims of Jones–Terrell's underhandedness—Mrs. Wallace (incapacitated), Mrs. Wallace's attorney, and the trial court. *Id.* at 501.

Clearly the conduct in *In re Jones–Terrell* was far more egregious than that at issue in this case. The respondent in *Jones–Terrell* violated several of our rules of professional conduct, including Rule 8.4 (dishonesty), all in an effort to profit from and defraud an elderly incapacitated client.

---

**41.** The primary asset in the Wallaces' estate was their home. *Id.* at 498.

**42.** Within a week of Mrs. Wallace signing the agreement, Family and Child Services of Washington had her examined for competency and she was found to be incapable of making rational decisions about her finances or her health. *Id.*

**43.** Jones–Terrell subsequently informed the guardian that she represented the Longs. Jones–Terrell lied again, however, by telling the guardian that Mrs. Wallace had waived the conflict. Shortly after the guardian was appointed, Jones–Terrell removed all of Mrs. Wallace's furniture from her home and induced her to sign a check for $250.00 payable to Jones–Terrell. *Id.* at 498–99.

There is no showing of dishonesty in this case or any fraud. As the Board in this case noted, *"In re Jones–Terrell* ... involved egregious overreaching by a lawyer with respect to her elderly and incapacitated client. We do not view the conduct here as comparable to that established in *Jones–Terrell."* Furthermore, we note that the conflict here was simply not as clear-cut and obvious as was the case in *Butterfield; McLain,* and *Jones–Terrell.* As the Board noted:

> [t]here are some conflicting considerations as regards the seriousness of the misconduct in this case. On the one hand, we have difficulty finding that the Respondent's violation resulted from more than one error of judgment regarding the permissibility of 'carving out' the conflicted aspect of the representation while preserving the broader attorney-client relationship, as opposed to a willful and knowing violation of the Rules.[44]

Based on the foregoing, we conclude that a sixty-day suspension is excessive. Taking into account Ponds subsequent public censure, and the excessive delay, we conclude that a suspension for thirty days, together with the requirement that Ponds undergo ethical training, is the most appropriate sanction in these circumstances. Our order follows:

1. Respondent Billy L. Ponds is hereby suspended from the practice of law in the District of Columbia for the period of thirty days. Respondent's attention is directed to the requirements of D.C. Bar R. XI, § 14, and their effect on his eligibility for reinstatement, *see* D.C. Bar R. XI, § 16(c).

2. As a condition of his reinstatement and before he resumes the practice of law following his period of suspension, respon-

dent shall file with the Board of Professional Responsibility and Bar Counsel a certification that he has completed a continuing legal education course on legal ethics or criminal practice covering conflicts of interest.

*So ordered.*

---

44. The Board also noted, "[o]n the other hand, the [r]espondent's approach may well have had serious adverse consequences for the client."